WILLIAM S. WISE, PLAINTIFF IN ERROR, V. JOSEPH NEWATNEY, DEFENDANT IN ERROR.

[FILED MAY 2, 1889.]

1. **Estoppel:** PRINCIPAL AND AGENT: EVIDENCE.  Where the whole tenor and purport of the testimony of three witnesses on the part of the defendant was to the effect and tended to prove that at the commencement and during the entire progress of the negotiations for the sale of the land, involved in the suit of P. L. W., who held the same by tax title, to the defendant, the plaintiff who afterward bought in the general title thereof and by this suit seeks to oust the defendant from the same, which he holds by deed from P. L. W., given pursuant to a sale made upon such negotiation, acted for and in concert with P. L. W., either as his agent or as joint owner with him of said land, and made certain statements to defendant as to the title of P. L. W. to the land, *held*, no error on the part of the trial court to instruct the jury in the following language: "Sixth. If you believe from the evidence that the plaintiff as the agent of his father (the said P. L. W.) or part owner of the premises in question, made certain statements, whether true or false, to the defendant, and whereby he induced him to purchase the premises in good faith and for a valuable consideration, and that the said defendant acted upon them, believing them to be true, the plaintiff is now precluded from asserting the contrary, and you must find for the defendant; for it is a rule of law that where one by his words or conduct willfully causes another to believe in a certain state of things and induces him to act on that belief so as to alter his own previous condition, the former is concluded from averring against the latter a different state of things."

2. **Evidence :** HEARSAY EVIDENCE.   Where a witness was called upon to testify as to words spoken to him in a language which he did not understand, and which were interpreted to him into his own language by an interpreter known to him, and in whom he confided, (in the presence of the speaker,) such testimony, *held,* unobjectionable as hearsay evidence.   See *Fabrigas v. Mostyn,* 20 S. T. 122, 123; S. C., 2 Wm. Bl. 929.

3. **Error without Prejudice.**   One of the principal issues presented was that arising upon the allegation of the defendant in his answer that the plaintiff, as the agent of his father, P. L. W., in order to induce defendant to purchase said land, assured him that at the expiration of four years from the date of the conveyance thereof, he, the defendant, would have an absolute title in fee simple; and there being evidence tending to prove that the plaintiff made such an assurance to the defendant before and at the time of the conveyance of the land by P. L. W. to the defendant, also that before and at the time of the making of such assurance the plaintiff was the general legal adviser of the defendant, *held,* that an instruction which, to the substance and general purport of the one quoted in the first clause of this syllabus, added words to the effect that if the jury should find that the defendant, in the purchase of said land, acted upon the said statements and representations of the plaintiff, " believing what plaintiff said and represented to him, the defendant, was true, and relied upon and acted upon said representations of plaintiff as their legal adviser, then you are instructed that the plaintiff cannot recover in this action," if error, which is not decided, was error without prejudice to the plaintiff.

4. **Evidence:** TAX DEED: TAX RECEIPTS.   Where the defendant prayed as alternative relief that he might be subrogated to the rights of his grantor, who held the land in controversy under a tax title, to a return of the money paid by him for such tax title, as well as for a return of taxes subsequently paid by defendant on said land in case of the failure of said tax title, *held,* that the admission of the informal and void tax deed under which defendant's grantor claimed to hold said land, and of the receipts for subsequent taxes paid by defendant on the land, for the purpose of establishing the amount of an alternative recovery therefor, was no error.

ERROR to the district court for Cass county.   Tried below before CHAPMAN, J.

*Covell & Polk,* for plaintiff in error, cited: *Haller v. Blaco,* 10 Neb. 38; *Howard v. Lamaster,* 11 Id. 584; *Thompson v. Merriam,* 15 Id. 499; *Baldwin v. Merriam,* 16 Id. 199; *Sullivan v. Merriam,* 16 Id. 161; *Morton v. Green,* 2 Id. 451; *Franklin v. Kelley,* 2 Id. 112; *Butler v. Davis,* 5 Id. 521, 525; *Dale v. Hunneman,* 12 Id. 221, 224; *Blazier v. Johnson,* 11 Id. 406.

*B. S. Ramsey,* and *Mathew Gering,* for defendant in error, cited: *Morton v. Green,* 2 Neb. 451; *Pettit v. Black,* 13 Id. 142; *Rex v. Inhabitants,* 4 T. R. 258; *Armstrong v. Lear,* 12 Wheaton, 175, 176; *Doe v. Stennett,* 2 Esp. N. P. R. 717; *Doe v. Somerville,* 6 B. & C. 126; *Phillips v. Covert,* 7 Johns. 4; *Chamberlain v. Donahue,* 41 Vt. 306; *Gatling v. Lane et al.,* 17 Neb. 77; *McKeighan v. Hopkins,* 14 Id. 364; *Roy v. McPherson,* 11 Id. 197; *Gillespie v. Sawyer,* 15 Id. 536; 2 Herman on Estoppel, 862, sec. 731.

COBB, J.

William S. Wise brought his action, in the nature of ejectment, in the Cass county district court against Joseph Newatney, for the title and possession of lots sixty-seven and sixty-eight in the east half of the southwest quarter of section twelve, in township twelve east; two small lots of land containing somewhat less than fifteen acres in the aggregate. The plaintiff, by his petition, alleged title, and the right of possession of said real property in himself, and the wrongful possession and the enjoyment of the rents and profits thereof by the defendant. The defendant, by his amended answer, denied each and every allegation of said petition, alleged and set out several purchases of said lots by one P. L. Wise at sales thereof by the county treasurer for delinquent taxes, the execution of several deeds therefor upon such sales by the said county treasurer to said P. L. Wise, and the due recording of such deeds, the tak-

ing of the possession of said land by the said P. L. Wise, under and by virtue of the said deeds, and the holding of such possession thereof by him until the conveyance by him thereof to defendant's grantor, thereinafter set forth; that on or about the 31st day of August, 1882, and prior thereto, the plaintiff was the agent of said P. L. Wise and wife, who are the parents of said plaintiff, and that as such agent and representative of said P. L. Wise and wife, did make certain representations to defendant, who, upon the date last aforesaid, and for some time prior thereto, was negotiating for the premises described in plaintiff's petition; that on or about the date last aforesaid, said plaintiff, in order to induce defendant to purchase said lands, assured him that at the expiration of four years from the date of said conveyance, he (the said defendant) would have an absolute title in fee simple, and then and there concealed the facts that a defect existed in the title to said lands, and that the said plaintiff intended afterwards to purchase the general title to said lands; that said plaintiff, acting as the agent of said P. L. Wise, as well as for himself, made the above fraudulent representations of said facts with full and complete knowledge of the condition of the title of said real estate, and that he failed to disclose said material facts with full knowledge of the condition of the title of said real estate; and that he failed to disclose such material facts; that such misrepresentations and concealments were made and withheld by said plaintiff with intent to induce defendant to act thereon, and defendant, being entirely ignorant of the condition of said title and other material facts, and relying upon the statements and representations of the said plaintiff, did so act thereon, and that for a valuable consideration, to wit, one hundred and fifty dollars, the said P. L. Wise, at the request and instigation of plaintiff, transferred said lands by quitclaim deed to one Melinda Newatney, which said deed was duly recorded, etc.; that on or about the 24th day of March, 1884, said Melinda

Newatney, who is the daughter of defendant, and to whom the misrepresentations and concealments of material facts as thereinbefore set forth, were also made, deeded said premises to the defendant, who was the real purchaser of said premises from said P. L. Wise and wife, and which fact was well known to the plaintiff.

Defendant further alleged that, by himself and his grantors, he had been in the open, notorious, exclusive, adverse possession of said premises for more than ten years prior to the commencement of said action; that valuable, permanent improvements had been made thereon; that the improvements made thereon by defendant are reasonably worth two hundred and fifty dollars; that defendant has paid the taxes on said land for the years from 1882 to 1886, both inclusive, amounting to twenty-five dollars and fifteen cents; that the cause of action of the said plaintiff did not accrue within three years next before the commencement of said action, etc.; with prayer that defendant's title to said premises may be quieted and decreed in him, and that if defendant's title to said land should be found to be invalid, defendant prays that the amount so paid by him, including the consideration for the purchase of the same, and the taxes paid thereon subsequent to said purchase, and the value of the improvements thereon, with interest, etc., be adjudged to be a lien upon said premises; and for general relief.

The plaintiff filed a reply which amounts to a general denial.

There was a trial to a jury with a verdict and judgment for the defendant. The plaintiff brings the cause to this court by petition in error. The following are the errors assigned:

I. The court erred in giving the paragraph of instructions numbered sixth of the instructions asked for by defendant, and given on his behalf.

II. The court erred in giving paragraph numbered second of the instructions given by the court on its own motion.

III. The court erred in giving paragraph numbered third of the instructions given by the court on its own motion, from the word "unless" therein.

IV. The court erred in admitting in evidence the testimony of defendant Newatney as to conversations had with P. L. Wise and W. S. Wise, concerning the tax title that was purchased by defendant of P. L. Wise and deeded by P. L. Wise to defendant's daughter, as it was all hearsay.

V. The court erred in admitting in evidence the tax receipts marked "exhibits S, T, U, V, & W."

VI. The court erred in admitting in evidence the testimony of Melinda Newatney as to communications had with P. L. Wise and W. S. Wise, respecting the purchase of the tax title made in her name from P. L. Wise.

VII. The court erred in admitting in evidence the records of tax deeds from "Book V" of deeds, etc.

VIII. The court erred in refusing to set aside the verdict.

On the trial, as appears by the bill of exceptions, plaintiff introduced in evidence a certified copy of a patent to one Wheatley Mickelwait, together with *mesne* conveyances, copies of *mesne* conveyances, and of proceedings of court in a certain proceeding in partition, constituting, as is believed, a chain of title to the plaintiff in the lands in controversy. The defendant testified in his own behalf through an interpreter, in answer to the question put by his counsel:

Q. Just give the conversation you had with W. S. Wise there at that time."

The interpreter translating for the witness said: "The first time he said he had $300 in money, and he was thinking about putting the money in the bank. Newatney said he had $300, and that Mr. Wise was a good friend of his, and so, he said, he fixed the money so he could put it in the bank, or in some good place, and Mr. Wise gave him the advice that 'I have land next to you there, and it would be pretty handy to you there, and you had better buy the land of me there.'

The same day he says Mr. Wise came up there in the afternoon and told him to go with him and he would show him the land. He said, he come over there, both of them, Mr. Wise's son and his father, and he told him he had better buy the land and he would not lose anything by it. If he put the money in the bank, he said, lots of places they rob the bank, and he may lose the money in the bank; he told him one thing, how they killed one banker in another place, and a woman, and stole the money. That is the way Mr. Wise told him." In answer to the question, "Did Mr. Wise, or didn't he, tell you anything about the title of this property," he answered as reported by the interpreter: "Mr. Newatney told him that he was afraid they may have some trouble with the land; and Mr. Wise said he needn't be afraid at all, that he only need pay two years' taxes on the land and then the land was his own and his heirs', and it would be just as good as if he paid eight years' taxes on it." I further copy the bill of exceptions:

Q. Did Mr. Wise ever say anything to you about the title that he had?

A. He told me that I didn't need to be afraid at all about the title on it; that I needn't be troubled about it at all; and he told me to put the land in his (my) daughter's name, so he couldn't lose anything by it; she was old enough by that time, and so when she be old enough he would give her a clear title to it after two years.

Q. Ask him whether Mr. W. S. Wise said anything to him about the length of time he had been in the possession of that property.

A. Mr. Wise owned the property for eight years, that is, that Wise told him eight years before he spoke to him anything about the land, and he said if Mr. Newatney paid the taxes on the land for two years, then he would give him a clear title to it.

Q. Did you rely upon these representations; did you believe Mr. Wise?    *    *    *

A. Yes, sir, I believed him.

Q. Did you act upon these representations, did you pay over the money?   *   *   *

A. I paid him the money.

Q. Did you act upon these representations; did you believe these statements?   *   *   *

· A. Because he was a good friend of mine I believed him all of the time—everything he said to me.

Q. And that is the reason why you paid over this money for this land?

A. Yes, sir, that was the reason I paid him the money.

Q. How much money did you pay him?

A. I gave him $150 that time.

Q. Who was there when you paid this money?

A. My boy was with me then.

Q. Who else?

A. There was only my boy and both the Wises.

Q. To whom did you pay this money?

A. He gave the money to the young man.

Q. Is that the man there, Wm. S. Wise?

A. Yes, sir.

Q. What did young Wise do with this money?

A. He put it in his safe.

Q. This was at whose office?

A. It was at the same place where Mr. Mercer has his office now.

Q. It was at young Mr. Wise's office?

A. Yes, sir.

Q. How long was Wm. S. Wise trying to get you to buy this land?

A. The third day I bought the land.

Q It was talked about three days?

A. Yes, sir.

Q. About what day of the month or year did the conversation take place?

A. I don't remember exactly when it was.   It was about

five years ago and on Saturday; I don't know what Saturday it was. * * *

Q. Did Wm. S. Wise ever come out there with his father?

A. He came out there Thursday afternoon.

Q. With this young man?

A. Yes, sir.

Q. And did they have this talk; that is, did Wise make this same representation to you there in the presence of his father that he made to you down in the office?

A. He was talking the same. He gave him the same representations.

Q. Both of these gentlemen talked the same way to him at that time?

A. Yes, sir.

Q. What did they say to you concerning the length of time that the Wises had been in possession at this time?

A. He said when they came out there they told him if he would take land he can put the land in his daughter's name, and that is the way he would be safe; and if he paid for two years' taxes, after two years he could come down to him and he would give him a clear title on it without any trouble.

Q. Who said that?

A. He said both of them.

Defendant further testified, through the interpreter, in reply to questions by his counsel, that he did not remember exactly on what day he took possession of the land; that he considered the land his when he gave them the money and he settled up; that then he commenced grubbing and clearing up the land, and he told his friends about it; that that was right away after the above conversation; that he commenced work upon it, and fenced it the first thing, right away after that Saturday; he hired two men and built a fence around it; that he was not right sure as to the time, but that it was about five years ago, or in 1882;

that since that time he had used the land as a pasture, and had been cutting out the brush, so the grass could grow and he could have the use of it; that he had worked there every year since that time; that he put a three-wire fence around it with hickory and different kinds of posts; that he used three bunches of wire in constructing the fence, for which he paid $49 ; that he burned the brush that was there and fixed it up so that the grass could grow and he could use the place for a pasture; that the work he did there was worth about $15 yearly, and for five years was worth about $75.    Defendant here offered receipts for the payment of taxes from 1882 to 1886, which, over exceptions of the plaintiff, were received in evidence.    Defendant further testified that he knew that Mr. Wise had the land for eight years; that he did not know who occupied the land, but that he knew that Mr. William S. Wise owned the land.

On reëxamination, he testified, in answer to a question by his counsel, that when he speaks to a gentleman who speaks the English language only, he has to have some one interpret the language for him.

Melinda Newatney, a witness for the defendant, testified that she was the daughter of the defendant.    In reply to the question whether she knew anything about the land in controversy here, said: Yes, sir; that she was there from the very beginning; that she heard what was said; that she had to talk everything that was said to her father; that she was acting as interpreter; that the first time that they went to Mr. Wise was when her father had $300 and wanted to put it in a bank; and they always went to Mr. Wise as their best adviser in such kind of matters; that they didn't know what to do with the money and went to him and asked him what to do with it, whether father could put it in a bank, and he would like Mr. Wise to tell him how to go to the bank and put it in, as father didn't know; and Mr. Wise said it was dangerous to put money in a bank;

that was Mr. Wise senior's advice; it was often robbed in a bank; that banks broke and he would not get his money. He said the best thing he could do with it was to put it in land; that he had a nice piece of land adjoining the property of father, and he had better invest the money in that, and there it would be safe. This was the old man Wise, in Mr. Wise junior's office. The witness continued : "I don't know just now whether both were there, but I know that Mr. Wise senior had the talk about the bank, and said he would see us in the afternoon about it, and in the afternoon of the same day Mr. Wise senior came out there and showed us where the property was that he wanted us to purchase, and told us all about it, and that he had had possession of the property eight years, and in two years more he could get a good title; he told us he had a great many acres there, and there was eleven in the same piece adjoining it, and if we would take the fifteen he had to have two years more before he could give a good title to it. He talked to father and told us how to get a good title for it after the two years was up — that we should go to Mr. Wise junior and get the deed. Mr. Wise senior said then that Mr. Wise junior would get the land, and he said that Mr. Wise was a very smart man. We always knew him, I thought, until lately, and we always went to him until lately, when he advised us. At the time he talked to us to invest, he showed us where the property was, and father told him he was afraid to take any such property — that a man might lose his money; he said if the owner came back in this time that his work would be paid for, and his money, with interest, and that the taxes would be paid back, and he wouldn't lose anything; that he would make the interest, which would be as much as if the money had been in the bank."

Q. Did you have any talk with young Mr. Wise?

A. He told us the same story over that his father had told us.

Q. What was it he told you?

A. That they had had possession of the land eight years, and that in two more years father would get a good claim, and that he would get a good deed as on the rest of our land; that it would be a good claim, just the same as a good deed, and that we would get that when the two years was up.

Q. What, if anything, did he say about his title to the land?

A. He said he had been paying taxes on it eight years, and in two years more it would be his own.

Q. Did he say he was in possession?

A. He said he had had it for eight years.

Q. In what way did he say he would perfect your title for you?

A. He said that we should go to him, and he would get it for us.

Q. Did he say how he was going to get it?

A. He said he had to go to law to get it, but that he would do all the business for us..

Q. Who was out there with Mr. P. L. Wise; was there anybody out there with him at any time?

A. In the morning when we were there Mr. P. L. Wise was in the office alone, and in the afternoon of the same day, they both came out there, but I can't tell whether—I am not sure they were both there, and father and mother and brother said they were both out there. I know I remember just as well as it was yesterday that Mr. Wise senior was there, and I know on the next day, Sunday morning, they both came out there; they measured the land; that is, on Sunday morning they both came up there and measured the land for us.

Q. What did they say about the ownership of the land?

A. They said they had had it in possession eight years.

Q. And would give you a good title?

A. Yes, sir; in two years more.

Q. Did William Wise say that?

A. Yes, sir.

Q. Tell us how long before you got the deed?

A. We got the deed on Saturday, and this was on Sunday, the next day.

Q. You got the deed before that?

A. Yes, sir; before they measured the land.

Q. Did you see the two Wises together before you got the deed?

A. Yes, sir; I am most positive they were both there on Thursday afternoon; and we seen them both in their office.

Q. Did you believe their statements?

A. Why, certainly we did.

Q. Did you act upon and rely upon the statements that Mr. W. S. Wise made you there in the presence of his father?

A. Yes, sir.

Q. When next did you see William S. Wise, and when did you have another conversation with him? After the time of the transfer of the property did you ever have any more talk with him?

A. We had talked with him quite often about it; we went there when the two years were up and wanted a good deed, and instead of that we got the same deed signed over, and father wanted the deed to him, and he got the same deed signed to him instead of in my name.

Q. What did you say to him at that time about the title he had promised you two years before?

A. I was not there only while the deed was signed, and my brother talked for my father, and they wanted me to go up there and sign my name to the deed, and so I willingly gave the property back to my father; I didn't want to, but I thought to save trouble I would do it. And Mr. Wise told me at the same time I would be just as well off without the property as with it, and I gave him back the property.

Q. Who advised the taking the deed in your name, if anybody?

A. Father was the first one that spoke; he wondered why it couldn't be that way, and Mr. Wise said it would do just as well if it was in my name. Of course, he said, nobody could take it away from me until I was twenty-one years old; but mother objected; but father didn't care, so Mr. Wise signed it to my name; and I helped coax father to have it signed to my name.

Q. Would you have purchased it at all if those representations had not been made to you by Mr. W. S. Wise?

A. No, sir; we wouldn't.

Q. Was you ever present when any money was passed?

A. Yes, sir.

Q. Who was present at the time when the money was paid over?

A. Mr. Wise senior and Mr. Wise junior, and my father and my brother and myself.

Q. Who paid the money?

A. My father.

Q. Who took the money?

A. Mr. Wise junior, and put it in his safe.

Q. How much was it?

A. One hundred and fifty dollars.

Q. He then gave you the deed, did he?.

A. Yes, sir; and the next day came and gave us five dollars back, and said it was only fourteen and a half acres.

The witness was here shown a deed, and was asked if that was the deed signed by W. S. Wise as witness. It was thereupon admitted by counsel for the plaintiff that it was the deed.

A. This is the first deed that was given to me; that is the deed that was first given to me when we first bought the property.

Q. Did you see Mr. Wise in 1887 at any place?

A. I saw Mr. Wise and asked him if he would be at his office, that I would like to talk the matter over before

it went into court, and he said he would be there in the afternoon; and I went, and he was not there.

Q. Was Mr. Wise ever at your house just before he commenced this action?

A. Yes, sir, twice, but I was not there at the time.

Q. Do you know what time your father took possession of this land; what time he commenced making improvements, if any?

A. He commenced right after; he wanted to use it for pasture. He commenced that fall, and let his cows run in there the first part of September.

Q. Do you know what improvements he put upon that land, if any?

A. He commenced gradually; he and my brother cut the brush out first, and burned it up, and then commenced fencing it in gradually; first a piece and then another, until they had it all fenced, and then cut down all the brush every year, so the grass would grow and the cows would run through there. He commenced every year, about spring, and cleared it all away, and cleaned it up. We use it now as pasture land; he digs up stumps at times when he has nothing else to do. Before we bought it there was big trees, and the winter before they were cut down into cord-wood and hauled to town by Mr. Miller. I saw Mr. Wise junior there measuring wood, and saw him measuring the same wood after he brought it to town. We bought the land in August, and the preceding December they cut the wood and hauled it to town, as I recollect.

Frank Newatney, a witness for defendant, testified that he is a son of defendant; that he has known Mr. Wise, the plaintiff, six or seven years; that he knows the premises in dispute between the parties to this suit, and that he knows of the sale of the land by Mr. Wise to his father.

He further testified that "We had some money, about $300, and were afraid to keep it at home lest the house might burn down or be robbed, and would like to put it in

Wise v. Newatney.

a bank, so it would not be lost, and went to Mr. Wise; he was a lawyer, and we thought he could tell us how to put it in a bank so it would not get lost; he said it would be better to put the money into land; that he had some land that he wanted father to buy; this was Mr. Wm. Wise, and just then there was a man came into his office, and he said he would see us later, and in the afternoon P. L. Wise came over and showed us the land, and told us about it; that he had possession for eight years, and that in two years more we could get a deed; and we asked him why he didn't keep it. He said he had got so much on hand, but said it was a good piece of land, and in two years we would get a good deed; but we were afraid of trouble. He said it would be no trouble; he said he would stand for the land; he said if before the two years passed the owner comes, that we would get our money back, and the interest, and pay for our improvements; and still we were not very much stuck on land. [The plaintiff moved to strike out all that P. L. Wise said when Will S. Wise was not present. Sustained.] And we still didn't want it, and they said they would come over and see us later; and they came over the next morning, both of them, and they told us the same thing they told us the first day; they said there was fifteen acres of land, and they had had possession of it eight years, and paid taxes on it eight years; if we paid taxes on it two years it would make ten years, and he would give us a good title, as good as a deed; and they kept coaxing us and wanted us to take it, and we took their words for it."

Q. Who were present when they made this statement?

A. Both of them.

Q. Who else?

A. Me, and my sister, and my father; I don't know whether my mother was by.

Q. Where did you say this conversation took place?

A. Over in our place, on our premises there.

Q. Then Mr. P. L. Wise, and W. S. Wise, and your father, and mother, and sister, were all present?

A. I am sure three of us were, I don't know whether my mother was or not; it was close to the house.

Q. Was that before the deed was made?

A. It was.

Q. Was you present when the deed was made?

A. I was.

Q. Where was it made?

A. At Mr. Will Wise's office.

Q. Who was present then?

A. Me, and my sister, and my father.

Q. Was there anything said by Mr. Will Wise or P. L. Wise as to how long they had had possession of the land?

A. They kept saying they had had it eight years; and we thought they were very sound and honest people.

Q. Did you see the money paid over?

A. I did.

Q. Who paid the money over?

A. My father.

Q. To whom?

A. He laid it on the table, and Mr. Will Wise took it and put it in his safe.

Q. Has it been your custom to interpret for your father?

A. We were both there; I talked for him as much as my sister.

Q. You always talked for your father a good deal of the time?

A. I talk for him a good deal, because my sister is not at home all of the time; but at that time she was at home.

Q. During the time your father had conversation with P. L. Wise and W. S. Wise, you talked for him, did you not?

A. I talked for him part of the time, and my sister part of the time.    *  *  *

Q. Did you see W. S. Wise just before this suit was commenced?

A. Yes, sir.

Q. Did your father, and you, and W. S. Wise, have any conversation?

A. Yes, sir.

Q. What did he say about the land?

A. He told me there was people running around after that land; that the town was booming; that somebody might buy it and pay my father back the interest; and I said how could they pay the interest, because he said it would be ours in two years; I told him that, and he told me not to be so smart; and I never talked to him any more, because if he did not want to talk to me I did not want to talk to him. This conversation took place at his office.

Q. He had sent for you to come to his office?

A. That is what I heard. I heard that from two of them.

Q. Who told you?

A. My mother, and there was a man there that Sunday; they told me that Mr. Wise wanted me to come to his office.

Q. Did Mr. Wise say anything about this land — make you any offer before commencing this suit?

A. My father was not there when he made that offer.

Q. What did he say to you?

A. He said that he bought the land of the owner and wanted to pay my father up.

Q. Pay up what?

A. Pay up his interest in it.

Q. Wanted to pay your father's interest in the land?

A. He wanted to pay my father up. He didn't say he wanted to buy his interest.

Q. What did you say?

A. I told him we wouldn't take the paying up of the interest; it would have to be through more hands than his hands.

Q. State what Mr. Wise said he wanted your father to give him for the land, either in this conversation or any other one? What was the proposition? What did Mr. Wise say he would take for the land?

A. He told me what we would give for the land to the owner. He asked me what the land was worth in the spring when the town was booming up, and my father said if it kept on booming it would be worth about $100 per acre.

Q. What did Mr. Wise say he would give your father?

A. He never said what he would give; he just said he would pay my father up.

Q. What did he want your father to give him? How much money did he say he would take from your father?

A. He never said how much money he would take from my father.

Q. In that conversation with Mr. Wise in which he said he would pay your father back, did you find out what he would take? Did he say what he would take from your father?

A. He did not.

Q. Did your father build any fence around his property?

A. Yes, sir; there is a fence there yet.

Q. Did you help him?

A. Yes, sir.

Q. What else did he do to improve the property?

A. He cleared the brush off as much as he could, when he had time, and kept care of it right along as if it was his own, because it was sold to him and told to him that it would be his own.

Q. You took possession of it, did you not?

A. Yes, sir, and took care of it just as if it was our own.

Q. State for what purpose you used it?

A. We used it for a pasture. It was right by the land we had used as a pasture.

Q. What kind of a fence was this?

A. A barbed-wire fence.

H. M. Miller, a witness for the defendant, testified that he had been a resident of the county and state for about eighteen years, and knew the plaintiff in this action. His examination was as follows:

Q. State whether you ever had any conversation with Will. S. Wise as to the property in this case and your going upon the property to cut the wood?

A. Yes, sir, I did.

Q. You were employed by William S. Wise, were you not?

A. Yes, sir.

Q. When was this?

A. I have most forgotten when it was, it was so long ago. I believe in 1880 or 1881; I think it was.

Q. While you were at work on that land, cutting timber, did Mr. W. S. Wise come out there at any time?

A. Yes, sir. If he hadn't I would have quit work.

Q. He came out there frequently, did he?

A. Yes, sir, once in a while.

Q. Did his father come out there also?

A. I wouldn't say positively about that, but I think he was out there.

Q. Were you under his direction when you were working on this land, or were you not?

A. I was.

Q. What did you do on the land?

A. I cut the timber off and hauled it to town.

Q. What did you do with the wood then at that time?

A. I put it right where he told me to put it.

Q. Where who told you to put it?

A. W. S. Wise.

Q. He told you where to put this wood?

A. They both told me to do that—P. L. Wise and W. S. Wise. That was on the branch of the creek up where Jerry Farthing had his brick kiln.

Q. Did you ever have any conversation with W. S. Wise about that land?

A. They told me they bought it for taxes and they had a right to take the timber.

Q. In conversation with father and son did they ever speak of it as our land?

A. They claimed to own it together; that is the way I understood it.

The defendant introduced a deed from P. L. Wise and Francis S. Wise to Malinda Newatney, in which this same land, lots sixty-seven and sixty-eight in section twelve, township twelve, range thirteen, Cass county, is described. The plaintiff objects because there is no foundation laid for the introduction of the deed and because it does not tend to show color of title in P. L. Wise. Objection overruled and exception taken, No. X. It is admitted that P. L. Wise executed the deed marked Ex. X.

The defendant also introduced the deed from Malinda Newatney to Joseph Newatney for the same property.

The witness J. M. Robinson, county clerk of Cass county, recalled, and having produced county Record V of deeds, turned to page 332, which, with page 333 and so much of 334 as relates to the property in question, purporting to be a tax deed by the treasurer of Cass county, conveying to P. L. Wise lots 67 and 68, the property in question. The plaintiff objects because there is no treasurer's seal attached to the deed, and because the deed does not show the place where the land was sold, and does not tend to show color of title. This objection was overruled and the record admitted in evidence.

The witness turned to page 335 of the same record. The defendant offered that deed and so much of the record on pages 335, 336, and 337, of the description of this property, as purports to be the deed from J. C. Cummings, treasurer of this county, to P. L. Wise. The plaintiff objects because it does not show the place where the land was

sold, and is without the seal of the county treasurer thereto, and is incompetent and irrelevant, and does not tend to show color of title. The objections were overruled and both deeds offered by defendant to show color of title. The plaintiff's objection to the deeds as tending to show color of title was sustained and exception taken.

David Campbell, a witness for the defendant, testified that he is treasurer of Cass county, and as such is authorized to collect the taxes of the county, and has in his possession the record of taxes collected on lots sixty-seven and sixty-eight in section twelve, township twelve, range thirteen, and by whom paid. The defendant thereupon offered in evidence the tax lists for the years 1874 to 1882, inclusive, showing that P. L. Wise had possession of said property and paid the taxes for the years mentioned. The plaintiff objected to the evidence as incompetent, immaterial, and irrelevant, which was sustained.

The plaintiff P. L. Wise, and Frank Knowlek, were sworn and examined as witnesses for the plaintiff in rebuttal. They contradicted nearly or quite all the testimony of the Newatneys in regard to the representations by the Wises or either of them, before, at the time, or subsequent to, the execution of the deed from P. L. Wise to Malinda Newatney. That of the witness Frank Knowlek tended to contradict some of the statements of defendant's witnesses as to the extent of improvements made upon the land in question.

I will examine such of the errors assigned by plaintiff as are discussed in the brief, in the order therein presented. Plaintiff first complains of the giving by the court of the sixth paragraph of the instructions, given as asked by defendant, as follows:

"6th. If you believe from the evidence in this case that this plaintiff, as the agent of his father, or part owner of the premises in question, made certain statements, whether true or false, to this defendant, Joseph Newatney, and

whereby he induced him to purchase the premises in good faith and for a valuable consideration, and that the said Newatney acted upon them believing them to be true, the plaintiff is now precluded from asserting the contrary, and you must find for the defendant; for it is a rule of law that where one by his words or conduct willfully causes another to believe in a certain state of things, and induces him to act on that belief so as to alter his own previous condition, the former is concluded from averring against the latter a different state of things."

The chief objection to this instruction urged by plaintiff is that it is not applicable to the evidence given in the case, and plaintiff urges that the instruction misled the jury by assuming that the testimony *showed* that the plaintiff was the agent of his father, P. L. Wise, or a part owner of the premises, and so forth.    Also that it further misled the jury that the testimony *showed* that he had willfully made certain statements to the defendant whether true or false, and so forth.

I do not understand this objection of the plaintiff to be well founded.    The instruction does not assume that the testimony *showed* anything.    The most that may be said is that it assumed that there was evidence before the jury tending to prove the facts alleged; and so far as this assumption may be imputed to it, I think that the evidence is equal to the assumption.    It is true that no witness testified as a fact that the plaintiff was the agent of P. L. Wise, and probably, that no one testified in so many words that the plaintiff was part owner of the property at the time of such sale by his father to Newatney.    But the whole tenor and purport of the testimony of the Newatneys, father, son, and daughter, was to the effect that during most or all of the negotiations which led up to the execution and delivery of the deed and the receipt of the money therefor, W. S. Wise acted for and in concert with P. L. Wise, the grantor in the deed, and I think it was the province of the jury to find from

these facts whether or not the plaintiff in these transactions acted as the agent of his father, P. L. Wise.   It is equally certain that the testimony of each of the Newatneys tends to prove that the plaintiff made statements to the defendant before and at the time of the purchase of the land whereby he was induced to make such purchase.

The instruction does not decide whether these statements were true or false, but tells the jury, in effect, that whether true or false, the plaintiff was estopped to deny them after defendants had acted thereon.   But the plaintiff contends as to the testimony of the defendant that it was all hearsay ; he, not understanding the English language, could not be permitted to state what the plaintiff said to him, or in his presence through an interpreter.   This might present a question of importance did the matter depend entirely upon the testimony of the defendant.   But leaving his testimony out of view, that of Malinda and Frank Newatney was to the same effect first and principally as that of the defendant.

As to the question of hearsay evidence, we are cited to no authority in support of the exclusion of the testimony, and have found, in the limited research given it, but one, in that of *Fabrigas v. Mostyn*, 20 S. T. 122, 123.   This was an action brought by the plaintiff against the governor of Minorca for false imprisonment and banishment.   It appears from the report that the imprisonment of the plaintiff by the government was sought to be sustained upon the ground that the plaintiff was guilty of mutiny and sedition. It further appears that the facts upon which the charge was sought to be fastened, were his seeking to bring an action against a certain officer of the island, called *the mustastaph*, for refusing to furnish the prisoner certain facilities for disposing of his wines.   It seems to have been deemed important to prove whether the accused sought to bring criminal or civil proceedings against said officer.   One James Wright, secretary to the governor, being on the stand as a witness for the defendant, and having testified

that Fabrigas came to him in his official capacity, witness asked him in the governor's name what he meant, whether a civil prosecution to recover damages against Ailimundo, *the mustastaph*, which he had sustained, or whether he meant to make an example of him for any abuse he had committed in office. * . * * Whereupon, Sergeant Glynn said: "I would not interrupt this evidence, as it does not appear to be of great consequence to us, but I submit to your lordship whether this is properly evidence, the answer being conveyed through an interpreter? and whether the interpreter should not be produced who knows what answers were given?" Mr. Lee: "We are now to take the answer from a man that does not know what the questions were, in a language the witness does not understand, and consequently cannot report if there were any, or what answers given; whereas there is a man living in the world who could report the answers that were given. I should not object to it, if that gentleman could himself understand the answers that were given." Mr. Justice Gould, before whom the cause was tried, said: "I think it is very clearly sufficient evidence." This ruling is referred to both in Phillip's and Greenleaf's treatises on Evidence, and being the only case cited by either, I do not think that authorities on this point are abundant.

The second point is that the court erred in paragraph second of instructions to the jury by the court on its own motion, as follows:

"If you find from the evidence that the defendant purchased the premises from the plaintiff's father, and that plaintiff negotiated said purchase on behalf of his father, and induced the defendant to purchase said premises, and represented to the defendant that the title he was purchasing from plaintiff's father would ripen into a perfect title within two years from defendant's purchase of the same, based upon the tax title then owned by his (plaintiff's) father, and that defendant purchased the premises in con-

troversy believing what plaintiff said and represented to him, the defendant, about said title, was true, and relied upon and acted upon said representation of plaintiff as their legal adviser, then you are instructed that the plaintiff cannot recover in this action."

Plaintiff in the brief points out the error in this instruction to be that the issue presented by the pleadings was that the plaintiff had stated to defendant, to induce him to purchase the tax title of his father, that his father's title would ripen into a perfect title in two years, and that he did this as their legal adviser, when there was no such issue presented by the pleadings; that the issue presented by the pleadings was that the plaintiff, as the agent of his father, P. L. Wise, in order to induce defendant to purchase said lands, assured him that at the expiration of four years from the date of said conveyance, (the quit-claim deed from P. L. Wise,) he, the aforesaid defendant, would have an absolute title in fee simple.

The doctrine of this instruction, as well as that of the other one, is that if the defendant purchased the land in question from plaintiff's father, and the plaintiff himself negotiated said purchase on behalf of his father, and during such negotiation represented to defendant such a state of things as existed in respect to the said land, if defendant would hold the same after such purchase and pay the taxes thereon for two years thereafter, the right which he purchased from plaintiff's father would ripen into and become an indefeasible title in defendant; and defendant having purchased said land by reason of such representations, and paid the taxes thereon for the full term of two years, then that plaintiff was estopped to deny that the defendant had such title in the land. If that position be a correct one under the law, then it was a true conclusion therefrom that the plaintiff could not recover in the said action, independent of and aside from the fact that plaintiff stood in the relation of legal adviser to the defendant

8

at the time of the making of such representations and the holding out of inducements to defendant to buy the said land. And the adding of the condition to the instruction by the trial court that in order to estop the plaintiff the jury must believe that he acted as the legal adviser of defendant when he made the representations and held out the inducements upon which he purchased the land, was against the defendant and in favor of the plaintiff. And if it was was error, which I do not decide, it was error without prejudice to the plaintiff.

It will be here observed that there appears to be a slight discrepancy between defendant's answer and his proof, in this—that the answer alleges in substance that in order to induce the defendant to purchase said land, the plaintiff represented to him that at the expiration of four years from the date of said conveyance he, the defendant, would have an absolute title in fee simple to the said land; whereas the evidence of some or all the witnesses for defendant was to the effect that plaintiff represented to defendant that plaintiff and his father had been in possession eight years, and that if defendant would continue in such possession and pay the taxes for two years from the date of the deed to Malinda, his title would ripen into a perfect and indefeasible title.

But there is no material discrepancy in the evidence. It tends to prove the substance of the answer and more. By the answer, the plaintiff is alleged to have represented that he had occupied the land and paid the taxes thereon for six-tenths of the time necessary to acquire a title to real estate by adverse possession, whereas the evidence tends to prove that he represented that he had been in such occupancy for eight-tenths of the time required for that purpose. This discrepancy is further rendered immaterial by the fact that more than four years elapsed from the date of the deed to Malinda before the commencement of this suit, or of the controversy which led up to it, and that during the whole of said time defendant remained in possession and paid the taxes on the land.

The third point discussed is that the court erred in the third instruction to the jury given on its own motion, from the word "unless" therein:

"Unless you find that the defendant's equity in said land and the title he purchased and took from plaintiff's father, was obtained by the defendant through the representations offered by plaintiff, and that defendant was induced to invest his means in said real estate and place improvements thereon under the advice and representations of the plaintiff that the tax title he was purchasing would speedily ripen into a complete legal title, for if the defendant did rely upon such representations made by plaintiff, if you find from the evidence that the plaintiff did make such representations, the plaintiff, being the son of the defendant's grantor and an attorney at law, would not be permitted to take advantage of the ignorance of the defendant as to the title he was induced to purchase, or take advantage of advice he had given him, if you find that he did give such advice, to obtain defendant's money and means by prevailing upon him to invest the same in the real estate in controversy, believing he was obtaining a good title to the same, by purchasing the outstanding title to said real estate for himself in order to oust defendant from said real estate and deprive him of the same, for the law will not permit a man to take advantage of his own wrong."

The answer to this argument of counsel must be in part a repetition of what has been said in answer to the first point. The instruction does not assume that the testimony shows the facts as stated above, but it properly assumes that the evidence tends to prove the facts stated in the instruction, which is, as appears to me, a fair *résumé* of the evidence on the part of defendant; that defendant, having confidence in the wisdom and integrity of the plaintiff, and having had the benefit of his legal services and advice on former occasions, went to his office for the purpose of consulting him in a matter of great importance to one of his

situation and fortune—about the depositing of a sum of money in bank. The weight of the testimony is that he failed to find the plaintiff in his office at the time, but found his father there, to whom he communicated the object and purpose of his visit; that he was cautioned against intrusting his money to a bank, but advised to invest it in land, informing him that he had a tract of land handy and contiguous to defendant which he desired to sell him, and thought would suit him. All three of the witnesses agree in substance that either at the time, or on a future occasion, at that place, or on the land itself, the plaintiff joined his father in these representations and efforts to negotiate the sale of said land to the defendant. It cannot be denied that they together explained to defendant the nature of the title held by the senior Wise, and that it was represented to be a title which by the lapse of time and the continued payment of taxes would ripen into an indefeasible title; but that should the owner of the genuine title to the land, whose identity and residence was then unknown to the parties, return and claim the said land before the ripening of the title then in the said P. L. Wise, (but which was sought to be disposed of to the defendant, and which was finally disposed of to him,) into a perfect title, then in that case, through the legal services and ability of the plaintiff, who was an attorney at law, the plaintiff would be enabled to realize all of the money paid for the original purchase, together with interest, all taxes which he should pay thereon, with interest, and compensation for all labor which he should bestow upon the land, before he could be compelled to relinquish the possession. Now if this state of things, which, as above said, the evidence tended to prove, was proved, then it requires no stretch of the doctrine of estoppel to cover the proposition that the plaintiff is estopped to assert a title acquired by himself, after these transactions, to the exclusion and denial of the right of the defendant. This is all that I understand the

instruction of the court, now under consideration, to tell the jury.

The plaintiff also assigns as error, as the fifth point in the petition in error, the admission in evidence of the receipts for taxes paid by defendant on the land in dispute. It will be seen by reference to the answer that the defendant prayed, as alternative relief, that in case his title to the land should be found defective, he be allowed a lien thereon for the amount paid for the purchase money, as well as for the taxes paid, and for improvements. It is assumed without a critical examination of the law, that a person in possession of land by virtue of a tax title, upon such title being adjudged invalid, is entitled to a judgment in his favor for the taxes paid in good faith, with interest. To lay the foundation therefor, it was necessary that he introduce his receipts for taxes paid subsequently to the acquisition of the tax title he offered in evidence. Hence there was no error in the admission by the court of such receipts, as evidence, when offered.

For the same purpose the tax deeds executed to the grantor of defendant, the admission of which is complained of by the *seventh* assignment, were necessary; for while the defendant in that event would probably not be entitled to the full amount paid by him to P. L. Wise on the purchase of said land, he would be entitled to be subrogated to all the rights of his grantor in the land, including a lien for the taxes actually paid by him for which he received these tax deeds, and for interest thereon; and these deeds were the only evidence of the payment of such taxes. They were, therefore, admissible in evidence.

By the *sixth* assignment, the plaintiff complains of the admission in evidence of the testimony of Malinda Newatney as to conversations had with P. L. Wise and W. S. Wise respecting the tax title in her name from the former. This conveyance was made to the daughter Malinda, for the defendant, as was understood at the time by both of

the parties, so that any conversation between the parties at and about the time of making the deed was equally applicable and admissible in evidence. as though the deed had been made directly to the defendant himself.

There appearing, therefore, no reversible error in the record, the judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.