### GUAN LEE v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. April 23, 1912.)

Nos. 1,814, 1,815, 1,816, 1,838, 1,839, 1,840.

1. ALIENS (§ 32*)—CHINESE—DEPORTATION PROCEEDINGS—EVIDENCE.
　　In Chinese deportation proceedings against certain alleged Chinese persons, evidence *held* to justify a finding that they belonged to the excluded class, and were unlawfully in the country.
　　[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 93–95; Dec. Dig. § 32.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2.** EVIDENCE (§ 333*) — CHINESE — DEPORTATION PROCEEDINGS — EVIDENCE — STATEMENT OF DEFENDANT.

Where, in Chinese deportation proceedings, an inspector testified that he took defendant's statement through an interpreter, that he wrote down everything that the interpreter told him, and the interpreter testified that he interpreted correctly, the written statement was admissible, though the inspector did not testify that he could not recollect what defendant said without referring to the writing.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1247–1257, 1259–1265; Dec. Dig. § 333.*

What Chinese persons are excluded from the United States, see note to Wong You v. United States, 104 C. C. A. 538.]

**3.** EVIDENCE (§ 333*)—CHINESE—DEPORTATION PROCEEDINGS—EXAMINATION BEFORE INSPECTOR.

Under Act Cong. March 3, 1901, c. 845, § 3, 31 Stat. 1093 (U. S. Comp. St. 1901, p. 1328), regulating the issuance of warrants in Chinese deportation proceedings and Regulations Rule 23, par. "a," p. 54 (Edition June 22, 1911), declaring that, before taking a Chinese laborer before a justice, judge, or commissioner and swearing out a warrant for his commitment and trial, full opportunity shall be afforded him to produce his certificate or other evidence of his right to remain in the country, it is proper for a Chinese inspector to examine a Chinaman as to his right to remain in the country through an interpreter before causing his arrest, and such examination is admissible in the absence of an objection and proof that defendant's statement was obtained through duress or improper influence, and was involuntary.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1247–1257, 1259–1265; Dec. Dig. § 333.*]

Seaman, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern District of Illinois.

Chinese deportation proceedings by the United States against Guan Lee, Guan Hen Lun, Moy Ah Toy, Chin Kong Poy, Lum Seong, and Jew Sam. From a decree ordering deportation, each of the defendants appeal. Affirmed.

Thomas E. & Frank T. Milchrist, for appellant Guan Lee.

James H. Wilkerson, U. S. Atty., John F. Voigt, Asst. U. S. Atty., and Edwin W. Sims, for the United States.

Before BAKER and SEAMAN, Circuit Judges, and SANBORN, District Judge.

SANBORN, District Judge. [1] It appears from the record in No. 1,814 that the appellant Guan Lee, about the middle of June, 1908, together with his cousin Ah Foon, also the appellant in No. 1,815, came from Hong Kong, China, to Vancouver, and immediately went to Montreal, where they stayed a week, and then went to Windsor, Canada, remaining there six or seven weeks, and then came from Windsor, Canada, to Chicago, Ill., in a box car loaded with brass tubing, reaching Chicago August 19, 1908. At Windsor Ah Foon paid a man $25 to put the two into a car bound for Chicago. They were told in Hong Kong that without papers they could not go to the United States through San Francisco; and in Montreal they were told they could not get into the United

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

States without papers. Nevertheless they went to Windsor, and when there was an opportunity for a fraudulent and secret entry, they availed themselves of it, and were arrested in Chicago for deportation shortly after their arrival there. The record further shows that the appellant Guan Lee, who it is admitted is a person of Chinese descent, at the hearing testified, through Charlie Kee, a Chinese interpreter, that he was 24 years old, was born in San Francisco in the United States; that his father and mother told him that they took him to China when he was 3 or 4 years old; that he lived in China with his mother until he came to the United States; that his father is now in China, and that his father bought his ticket and gave him $100 to pay for train, etc., to the United States; that he lost his money in Windsor, Canada, and that his cousin paid $25 to "one of the American men" to put him on the train (in the box car) to come to the United States; that people said they didn't have any paper of any kind, and that they could not board a passenger train; that he expected to do anything in the United States. The evidence introduced in his behalf at the hearing failed to satisfy both the commissioner and the District Court that he was lawfully entitled to remain in the United States, and the United States commissioner and the district judge, after considering all of the evidence on both sides, found against the appellant as "by the law the Chinese person must be adjudged unlawfully within the United States unless he 'shall establish by affirmative proof to the satisfaction of such justice, judge or commissioner, his lawful right to remain within the United States.'"

The record in No. 1,815 shows substantially the same facts as in No. 1,814. In No. 1,816 appellant testified he was born in San Francisco, but he told the interpreter when he was taken into custody that he was born in Ne On village, China. In No. 1,839 substantially the same facts appear as in 1,816; it being also shown that appellant paid the Canadian head tax of $500.

In No. 1,840 the facts are substantially as in 1,839, except that appellant's testimony that he was born in San Francisco agrees with his statement to the interpreter when arrested. He says he returned to China and then came back to the United States via Vancouver and Toronto, paying the Canadian head tax of $500. Like the others, he came in by the "underground railroad," managed by white men who are accustomed to put these emigrants into box cars bound for the United States for the small consideration of $25. The testimony did not satisfy the commissioner, or the District Court, nor does it satisfy us, that any of these appellants had a lawful right to remain in the United States. As held in the case of Chin Bak Kan, 186 U. S. 193, 22 Sup. Ct. 891, 46 L. Ed. 1121, a mere assertion of citizenship is not enough to overcome the heavy burden of proof cast upon a Chinaman seeking to remain in the country. The facts on which such a claim rests must be made to appear. The decrees in the cases referred to should all be affirmed.

This leaves only No. 1,838 to be considered. There are material differences between this and the other cases. In the first place, Chin Kong Poy, the appellant, testified before the district judge: That he was 31 years old, and was born in San Francisco. He lived there 14 or 15 years, and in Chicago 15 or 16 years. That his father's name was Chin Rung Ngon, in the Chinese grocery business with the firm of Quong Yet Woo, 740 Commercial street, San Francisco. Lived over the store. Attended Chinese school while in San Francisco, teacher's name Lee Yen. Remembers names of some of the school boys, Yu Hock, Yu Wah, Moy Chung, and Non Tome. Came to Chicago about one year after father and mother went to China (1895). His maternal uncle, Moy You, came to Chicago with him. In San Francisco they lived four or five blocks from the bay. It is downhill from where they lived to the bay. Not married. He gave Mr. Thompson, the inspector, his family name and his school name. Lives at Sixty-Sixth and Wentworth avenue, Chicago. On cross-examination he testified, when asked if he did not tell the interpreter when arrested that he had been in China more than 10 years, that he told him that his father and mother went to China, that his father, and not he, came back on a merchant's paper. He further said the inspector told him, through the interpreter, that, if he did not talk, they would put him in jail, and he did not know what he was talking about. His uncle, Moy Yu, testified in corroboration of the foregoing. Moy Yu Oak also testified that appellant was brought to his laundry by Moy Yu 16 years before, when he was about 15 years old, and he had known him ever since. He worked in that laundry about a year. Appellant also testified where he had worked in Chicago, and that is in part corroborated by Moy Yu.

From the printed record of the testimony as so summarized, and without seeing the witnesses, the evidence would seem to show enough, perhaps, to justify appellant's right to remain in the country were it not for the testimony of the interpreter and inspector, as to appellant's statements when he was arrested. Almost everything in the rest of the evidence is flatly contradicted by this statement, except he says he was born in California. He admits going to Detroit and Ann Arbor, which explains why he happened to be arrested; the immigration officers no doubt believing he had come from Windsor, Canada, on one of the underground railroad routes.

[2] When arrested, appellant was taken to the office of Ward E. Thompson, the inspector, where he was questioned through an interpreter, Edward B. Kan. Mr. Kan testified that the questions were asked by Mr. Thompson in English, translated into Chinese, and put to appellant, and the answers translated into English, and that the interpreting was correctly done, but did not testify what appellant said. Mr. Thompson testified to substantially the same facts, except that he does not understand the Chinese language. He says he wrote down everything the interpreter told him appellant said, among other things that he was born in San Fran-

cisco, and had been in this country ever since.    Thompson did not expressly testify that he could not recollect what appellant said without referring to the written record of appellant's statement.   Objection was made that, although the witness might properly refer to the paper for the purpose of refreshing his memory, he should not be permitted to read the statement for any other purpose; no opportunity to cross-examine being afforded, and the examination was not made under oath.   The objection was overruled, and the witness allowed to read his report by question and answer.

[3] It is urged for the appellant that the practice of investigation by inspectors in case of detention of suspected Chinese persons is an unwarranted infringement upon their rights.   This procedure, however, is necessary to any efficient administration, affords the Chinaman an opportunity to show any evidence he may have of his right to remain, or otherwise present his side of the case, and is also supported by the rules of the department.

The inspectors of the immigration service are authorized by statute to file complaint in Chinese cases.   Section 3, Act of March 3, 1901 (31 Stat. p. 1093), reads as follows:

"That no warrant of arrest for violations of the Chinese-exclusion laws shall be issued by the United States commissioners excepting upon the sworn complaint of a United States district attorney, assistant United States district attorney, collector, deputy collector, or inspector of customs, immigration inspector, United States marshal, or deputy United States marshal, or Chinese inspector, unless the issuing of such warrant of arrest shall first be approved or requested in writing by the United States district attorney of the district in which issued."

The rule in regard to the arrest of Chinese reads as follows (rule 23, paragraph "a," p. 54, Regulations Governing the Admission of Chinese, Edition of June 22, 1911):

"Chinese found in the United States engaged in laboring pursuits and not having in their possession a certificate issued under either the act of May 5, 1892, or the act of November 3, 1893, or other satisfactory evidence of their right to be and remain in the country, are subject to arrest and deportation. Full opportunity to produce the certificate or other evidence shall always be accorded, under proper safeguards, before taking a Chinese laborer before a justice, judge, or commissioner of a United States court and swearing out a warrant for his commitment and trial."

It was the duty, therefore, of Inspector Thompson to find out whether Chin Kong Poy was lawfully here, and to learn this by examining him in order to decide whether he should be arrested and brought before a commissioner for deportation.   While it is true that such an examination may be improperly conducted by officers who may have grown narrow and rigid by reason of constant dealing with a special class of cases, and who may have become overzealous, or too anxious to make a record with their superior officers, yet this question is not properly before us.   Had an objection on this ground been made, it would have been the duty of the trial judge to take evidence as to whether or not this Chinaman's statement was voluntary, and, if found to have been made

under duress or improper influence by the inspector or interpreter, to rule the statement as inadmissible. No objection of this kind was made, so that the only question presented is whether the inspector's testimony, supplemented by that of the interpreter, was properly admitted.

Mr. Thompson testified that he wrote down everything the interpreter told him appellant said, and the interpreter says he correctly interpreted. It is undeniable that reading from the notes must be more persuasive and satisfactory, and furnish a truer account of the real statement of appellant than any attempted reproduction of what occurred by the inspector's statement of any present memory he may have had. "Remember yourself by papers, if you have any. No man will hinder you." Downes' Trial, 5 How. St. Tr. 1209, 1213. "The propriety of the rule * * * may be inferred from its necessity. And the occurrences of everyday furnish abundant proof that the ordinary transactions of life could not be carried on upon any other principle." State v. Rawls, 2 Nott. & McC. (S. C.) 333. "To exclude such a record, when honestly made, would be to reject the best and frequently the only means of arriving at the truth." Halsey v. Sinesbaugh, 15 N. Y. 485; Insurance Co. v. Weides, 14 Wall. 379, 20 L. Ed. 894. These quotations are taken from 1 Wigmore's Ev. § 735. The witness testified from his past recollection of what appellant said, taken down by him at the time. The statement admitted meets all the tests of the decisions. It was taken down at the time, it was correctly written, the witness having guaranteed its accuracy, he wrote it himself, the original writing was produced, and inspection and cross-examination were allowed. The authorities are examined by Mr. Wigmore (sections 744–754), and the writing is abundantly brought within them. A clear case of past recollection is established, of much greater probable accuracy than any possible present recollection.

The statement thus having been properly admitted, the only remaining question is whether or not it was also necessary for the interpreter to have testified to the correctness of the statement, in addition to stating that he correctly interpreted. This question will now be considered.

Bearing in mind that appellant is a party, and that it is his own statement which was sought to be proved, the law is well settled in favor of admissibility without the necessity of even calling the interpreter. When a conversation takes place between a person whose declaration is admissible in evidence and another, and they call in or assent to the use of an interpreter in order to enable them to speak with each other, each one adopts a mode of intercommunication in which they necessarily assume that the interpreter is trustworthy, and which makes his language presumptively their own. In Commonwealth v. Vose, 157 Mass. 393, 32 N. E. 355, 17 L. R. A. 813, the case was this:

"Thomas S. Vose was convicted of committing an abortion on one Mary Tallon. At the trial of the case in the superior court one Berube was called

as a witness to testify in behalf of the government, and testified, through Adelard Perror, a police officer, who acted as interpreter for him at this trial, that he (Berube) went with the said Mary on a certain night to defendant's house, and when they (Berube and the said Mary) had entered the house of defendant a conversation in the French and English languages took place between the said Mary Tallon and defendant, and that Mrs. Vose, the wife of defendant, acted as interpreter for them on this occasion, and the questions were put by the defendant Vose to Tallon and by her to him. It was in evidence that defendant's wife was a French woman, and that she could converse in the French and English languages, and that the said Mary was French, and that she could neither speak nor understand the English language, that the defendant could neither speak nor understand the French language; and it was not shown at the trial that Berube could understand language addressed to him in English, except imperfectly. Berube was allowed to state the conversation carried on between defendant and Mary on the night in question to show that she went there to have an abortion performed, and that defendant agreed to perform it. Defendant excepted to Berube's testimony. Exceptions overruled."

## The opinion by Judge Knowlton in its entirety is as follows:

"The defendant excepted to the admission in evidence of a conversation between him and the deceased person carried on through an interpreter, he speaking English and she French, and the witness understanding only French. When two persons who speak different languages, and who cannot understand each other, converse through an interpreter, they adopt a mode of communication in which they assume that the interpreter is trustworthy, and which makes his language presumptively their own. Each acts upon the theory that the interpretation is correct. Each impliedly agrees that his language may be received through the interpreter. If nothing appears to show that their respective relations to the interpreter differ, they may be said to constitute him their joint agent to do for both that in which they have a joint interest. They wish to communicate with each other, they choose a mode of communication, they enter into conversation, and the words of the interpreter, which are their necessary medium of communication, are adopted by both, and made a part of their conversation as much as those which fall from their own lips. They cannot complain if the language of the interpreter is taken as their own by any one who is interested in the conversation. Interpretation under such circumstances is prima facie to be deemed correct. How far either would be bound by it if the interpreter should prove false may depend on a variety of circumstances which it is unnecessary to discuss. In a case like the present, we are of opinion that either party, or a third party, who hears the conversation, may testify to it as he understands it, although for his understanding of what was said by one of the parties he is dependent on the interpretation, which was a part of the conversation. The fact that a conversation was had through an interpreter affects the weight, but not the competency of the evidence. Camerlin v. Palmer Co., 10 Allen (Mass.) 539; Greenl. Ev. § 183; Fabrigas v. Mostyn, 20 State Tr. 171."

This case was followed by Commonwealth v. Storti, 177 Mass. 339, 58 N. E. 1021, where the opinion was by Chief Justice Holmes, now Mr. Justice Holmes of the United States Supreme Court, and in which he said:

"An objection was taken to the stenographer's evidence on the ground that it was hearsay, as he merely put down what the interpreter reported. But, without seeking for further possible answers, it is enough to repeat that the interpreter testified that he reported correctly. See Com. v. Vose, 157 Mass. 393, 32 N. E. 355, 17 L. R. A. 813. It would be refining too much, and not in the direction of accuracy, to say that the confessions, although taken down in their English translation, should have been proved in Italian, and then translated for the jury. The English was the most accurate evidence attain-

able at the time of the trial. Camerlin v. Palmer Co., 10 Allen [Mass.] 539, 541."

The same rule has been held in the following cases: Meacham v. State, 45 Fla. 71, 33 South. 983, 110 Am. St. Rep. 61; Sullivan v. Kuykendall, 82 Ky. 483, 489, 56 Am. Rep. 901; Blazinski v. Perkins, 77 Wis. 9, 45 N. W. 947; Wise v. Newatney, 26 Neb. 88, 42 N. W. 339, and Miller v. Lathrop, 50 Minn. 91, 52 N. W. 274. See, also, Wigmore on Evidence, § 668. We have no hesitation in applying these authorities, and in concluding that the testimony of the interpreter was sufficient, and that of the inspector as clearly admissible. Appellant's deportation having been ordered by both the commissioner and the trial judge, and being justified by the evidence, the decree should be affirmed.

The decrees in Nos. 1,814, 1,815, 1,816, 1,838, 1,839, and 1,840 are affirmed.

SEAMAN, Circuit Judge (dissenting). I concur for affirmance of the orders appealed from excepting in the case of the appellant Chin Kong Poy. The facts in that case, as plainly differentiated in the opinion, leave no room, as I believe, for application of the rule under which the other cases are affirmed.

The order rests alone on the notes of the inspector of all statements made by the Chinaman (after his arrest) through an interpreter called by the inspector for the examination. I am not satisfied that the notes were competent evidence for any purpose, without verification by the interpreter. If admissible, however, I am of opinion that they furnish no ground for the deportation order, under the appellant's testimony as to his actual statements and the corroborations of his further testimony that he was born in San Francisco and continuously remained in this country, in San Francisco 15 years and in Chicago thereafter, at places of residence named. Prima facie the appellant is a native of this country, and not subject, as I believe, to the harsh rule of the statute as to the burden of proof; but his testimony impresses me as sufficient to overcome that burden, unless it is impeached or controverted. I believe, therefore, the order should be reversed for retrial of the issue, whereupon the appellant's testimony may be inquired into and tested.