## LEE et al. v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. August 17, 1926.)

No. 1929.

1. **Conspiracy** ⚖⟹48.

In prosecution for conspiring to fraudulently import and bring intoxicating liquor into the United States in violation of Tariff Act 1922, §§ 591, 593, and Act Oct. 28, 1919, tit. 2, § 3, question of defendant's guilt *held* for the jury (Comp. St. §§ 5841h10, 5841h12, 5841h13, 10138½aa).

2. **Customs duties** ⚖⟹126—**Intoxicating liquors** ⚖⟹246—**Seizure of vessel and liquor beyond 12-mile limit held illegal, in absence of ratification by government by institution of legal process to enforce forfeiture of boat and liquor (Tariff Act 1922, § 581 [Comp. St. § 5841h]).**

Search and seizure, by officers of the Coast Guard beyond the 12-mile limit, of vessel owned by defendant, for intoxicating liquors, *held* illegal, as not being authorized, either by Tariff Act 1922, § 581 (Comp. St. § 5841h), when construed in the light of Rev. St. §§ 2760, 3059, 3098–3101 (Comp. St. §§ 5761, 5810–5813, 8459½b[52]), or the common law, in absence of showing that their act of seizure was adopted and ratified by government by institution of legal process to enforce a forfeiture of the boat and liquor, irrespective of whether officers had probable cause to believe that vessel was violating the law, and was a subject of forfeiture.

3. **Criminal law** ⚖⟹393(1)—**Admission of evidence obtained by illegal search and seizure, through officials of United States acting under color of their office, held to violate defendant's constitutional rights (Const. Amends. 4, 5).**

In prosecution for conspiring to fraudulently import intoxicating liquor into the United States, in violation of Tariff Act of 1922, §§ 591, 593 (Comp. St. §§ 5841h10, 5841h12, 5841h13), admission of evidence obtained by illegal search and seizure beyond the 12-mile limit, through officials of the United States acting under color of their office, *held* to violate defendant's right guaranteed by Const. Amends. 4 and 5.

Anderson, Circuit Judge, dissenting.

.In Error to the District Court of the United States for the District of Massachusetts; John A. Peters, Judge.

James M. Lee and others were convicted of conspiring to fraudulently import and bring intoxicating liquor into the United States, and the named defendant brings error. Verdict set aside, and case remanded for further proceedings.

Leo A. Rogers, of Boston, Mass. (Daniel A. Shea, of Boston, Mass., on the brief), for plaintiff in error.

George R. Farnum, Asst. U. S. Atty., of Boston, Mass. (Harold P. Williams, U. S. Atty., of Boston, Mass., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. The defendant Lee, with two others, was indicted for conspiring to fraudulently import and bring intoxicating liquor into the United States in violation of sections 591 and 593 of the Tariff Act of 1922 (42 Stat. c. 356, pp. 981, 982 [Comp. St. §§ 5841h10, 5841h12, 5841h-13]), and section 3, title 2, of the Act of October 28, 1919 (41 Stat. c. 85, p. 308 [Comp. St. § 10138½aa]). One of the parties was acquitted, Lee and the other defendant were convicted, and Lee brings this writ of error.

The assignments of error present three contentions: (1) That there was no evidence sufficient to warrant a finding that Lee was guilty; (2) that the court erred in admitting evidence of the seizure of the vessel and the liquor, on the ground that the evidence was wrongfully obtained; that the Coast Guard had no legal authority to seize the vessel and liquor outside the 12-mile limit; (3) that in its charge the court below permitted the jury to take into consideration the admissions of the other two defendants to Finnegan, a deputy surveyor of the customs office, after their arrival at Boston, and after the termination of the conspiracy, as evidence against Lee.

No evidence was introduced by the defendants. The government called three witnesses. Smalley, a member of the Coast Guard, testified that on February 16, 1925, he saw the motorboat D–683 proceeding in an easterly direction from Gloucester; that he followed it out in a Coast Guard patrol boat, being about 500 yards behind it, to a point about 24 miles easterly of Boston Light, where he lost sight of it somewhere about 5 o'clock; that about 6:30 p. m. he

discovered the boat alongside the schooner L'Homme; that he put a searchlight on her and told those on board to put up their hands; that he found on board the boat the three defendants and a number of cans of alcohol; that he searched the defendants, put two of his men on board the boat, and took her, the liquor, and the three defendants into Boston.

Finnegan testified that he took the statements of the three defendants on their arrival in Boston; that McNeil, one of the defendants, stated that Lee hired him on Sunday, February 15, to take the boat from Gloucester out to rum row and get a lot of liquor, and that he intended to land the liquor at Gloucester on his return; that, after about 2½ hours' sail, they pulled up alongside of a four-masted schooner; that the crew of the schooner loaded the liquor upon their boat; and that just then the revenue cutter came along and took them.

Finnegan further testified that Viera, one of the defendants, stated to him that on February 15 he met some men in Gloucester whom he did not know, one of whom he afterwards learned to be Lee, and accepted their invitation to go out in a boat on Monday, the 16th; that they left the steamboat wharf at Gloucester after dinner, and sailed 2 or 3 hours; that about sundown they stopped alongside a vessel, the crew of which loaded their boat; and that then the revenue cutter took them.

Finnegan also testified that Lee stated that he lived at 10 Locust street, Gloucester; that on Monday, February 16, he was asked by McNeil to go out and work on the engine of a motorboat; that he ran the engine, and the first thing he knew he was alongside of a schooner; that he did not see any cases of alcohol on board until captured by the revenue cutter.

The registration of the motorboat in Lee's name was put in evidence.

The liquor seized was grain alcohol—intoxicating liquor within the meaning of the Prohibition Law. All the evidence obtained by the search and seizure of the boat and liquor outside the 12-mile limit was admitted subject to the exception of all the defendants. The defendants seasonably moved to suppress this evidence, on the ground that it was obtained by an unlawful search and seizure at a point 24 miles distant from the nearest land. The statement to Finnegan of each defendant was admitted only as against the particular defendant making the statement.

Mrs. Rose Smith testified that she recog-

nized Lee as the person who lived at her house under the name of Isidore Leach; that she knew him by no other name.

At the close of all the evidence the defendants moved for a directed verdict.

[1] We think there was sufficient evidence to warrant the submission of the case to the jury; that, from it, it could be reasonably inferred that on the afternoon of February 16 Lee and the other defendants went out from Gloucester in Lee's motorboat for the purpose of obtaining liquor at rum row and bringing it to Gloucester.

The second and principal contention in the case is whether the evidence procured by the officers of the Coast Guard in visiting, searching, and seizing the motorboat and liquor at a point 24 miles or more from the nearest land was properly admitted in evidence. It is contended on behalf of Lee that the visitation and search of his motorboat, and seizure of the boat and the liquor by the Coast Guard, was illegal and in violation of the Fourth Amendment of the Constitution, and that its admission in evidence was in violation of the Fifth Amendment; that it was illegal and in violation of the Fourth Amendment (1) for the reason that, under section 581 of the Tariff Act of 1922 (Comp. St. § 5841h), the officers of the Coast Guard were without authority to visit, search, and seize any vessel, domestic or foreign, on the high seas more than 4 leagues from the shore; and (2) if the Coast Guard had authority to seize an American vessel more than 4 leagues from the shore, the vessel being engaged in violating a law of the United States, that at the time of the seizure here in question the vessel was not violating any law of the United States; that its presence where it was when seized was lawful, and the fact that it had taken liquor on board at that point was not a violation of any law of the United States; that the liquor at the place of seizure was not contraband and subject to seizure; that the entrance upon and the search and seizure of the vessel and liquor by the Coast Guard differed in no respect from the situations presented in Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann Cas. 1915C, 1177, Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319, Gouled v. United States, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647, Amos v. United States, 255 U. S. 213, 41 S. Ct. 266, 65 L. Ed. 654, and Flagg v. United States, 233 F. 481, 147 C. C. A. 367.

The contention on behalf of the government is that the visitation, search, and seiz-ure of the vessel and liquor on the high seas and beyond the 12-mile limit was lawful; that if section 581 of title 4 of the Tariff Act of 1922 restricted the authority of the Coast Guard, as to the right of visitation and search of vessels on the high seas, to waters within the 12-mile limit, it did not restrict their authority to such waters as to seizure; that by implication, or under the common law, the Coast Guard were authorized to seize an American vessel on the high seas beyond the 12-mile limit for a violation of our laws; that the vessel in question was violating our laws by having liquor on board and was subject to seizure; that the liquor was contraband and also subject to seizure; and that, the seizure of the vessel and liquor being legal, the evidence procured thereby was competent and properly admitted.

Section 581 of the Tariff Act (42 Stat. p. 979 [Comp. St. § 5841h]) is the only statute to which our attention has been called, or of which we are aware, defining the authority of the Coast Guard in the visitation, search, and seizure of vessels, American or foreign, on the high seas, and that act, in defining their authority as to these matters, limits it to waters within four leagues of the coast of the United States. It reads:

"Sec. 581. *Boarding Vessels.*—Officers of the customs or of the Coast Guard, and agents or other persons authorized by the Secretary of the Treasury, or appointed for that purpose in writing by a collector, may at any time go on board of any vessel or vehicle at any place in the United States or within four leagues of the coast of the United States, without as well as within their respective districts, to examine the manifest and to inspect, search, and examine the vessel or vehicle, and every part thereof, and any person, trunk, or package on board, and to this end to hail and stop such vessel or vehicle, if under way, and use all necessary force to compel compliance, and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel or vehicle, or the merchandise, or any part thereof, on board of or imported by such vessel or vehicle is liable to forfeiture, it shall be the duty of such officer to make seizure of the same, and to arrest, or, in case of escape or attempted escape, to pursue and arrest any person engaged in such breach or violation."

The Circuit Court of Appeals in the Second Circuit, in an opinion handed down in July, 1926, in the case of United States v. American Steam Screw Underwriter, 13 F.

(2d) 433, in construing section 581, expressed the view that this section was intended to give the Coast Guard authority to stop, board, search, and seize foreign vessels coming within the 12-mile limit, but was not intended to restrict their power in this respect as to American vessels beyond the 12-mile limit. In other words, that court apparently considered that the Coast Guard, apart from the authority conferred by section 581, had authority to visit, search, and seize American vessels beyond the 12-mile limit. It was there said:

"Section 581 of the Tariff Act of 1922 was intended to give the Coast Guard authority to stop, board, search, and seize foreign vessels coming within the 12-mile limit. It was not intended as a delimitation of the powers of that service forbidding search, seizure, or detention of American boats beyond the 12-mile limit. It was a recent enactment, intended to serve notice upon nationals of other countries coming within the 12-mile limit, who attempted the violation of the laws of the United States."

We do not agree to this construction of the statute. The Tariff Act of 1922, in section 642 (Comp. St. § 5841i–l), expressly repealed section 3095 of the Revised Statutes (Comp. St. § 5807), which was the predecessor of section 581 relating to this subject. Section 3059 of the Revised Statutes (Comp. St. § 5761) reads as follows:

"It shall be lawful for any officer of the customs, including inspectors and occasional inspectors, or of a revenue cutter, or authorized agent of the Treasury Department, or other persons specially appointed for the purpose in writing by a collector, naval officer, or surveyor, to go on board of any vessel, as well without as within his district, and to inspect, search, and examine the same, and any person, trunk, or envelope on board, and to this end to hail and stop such vessel if under way, and to use all necessary force to compel compliance; and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which such vessel, or the merchandise, or any part thereof, on board of or imported by such vessel, is liable to forfeiture, to make seizure of the same, or either or any part thereof, and to arrest, or in case of escape, or any attempt to escape, to pursue and arrest any person engaged in such breach or violation."

A comparison of sections 3095 and 581, discloses that Congress in enacting section 581, substituted officers of the Coast Guard for officers of the revenue cutter (see Act of January 28, 1915, c. 20, §§ 1 and 2, 38 Stat. p. 800 [Comp. St. §§ 8459½a(1), 8459½a-(2)]), and incorporated therein certain provisions contained in section 3061 of the Revised Statutes (Comp. St. § 5763), relating to the right to stop, search, and seize vehicles on land, but omitting the requirement of probable cause there provided for, and that section 581 extends the authority of the officers named, as to the visitation, search and seizure of vessels, American or foreign, to include waters on the high seas and within 12 miles or 4 leagues of our shore, while the repealed section 3059 limited their authority as to visitation, search, and seizure, to territorial waters or 3 miles. This has been the practical construction of section 3059 by the officers of the government charged with its enforcement. Carroll v. United States, 267 U. S. 132, at 153, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790. In that case it is said that the Attorney General, in construing an act of Congress relating to Alaska giving power to customs officers to seize vessels for violation of law, advised the government:

"'If your agents reasonably suspect that a violation of law has occurred, in my opinion they have power to search any vessel within the 3-mile limit according to the practice of customs officers when acting under section 3059 of the Revised Statutes, and to seize such vessels.' 26 Opinions Attorneys General, 243."

It is evident, therefore, that so far as officers of the customs or of the Coast Guard derive authority from acts of Congress to visit, search and seize vessels, American or foreign, on the high seas, it is limited to waters within 4 leagues or 12 miles of our coast, and that their authority to visit, search and seize vessels on the high seas more than 4 leagues or 12 miles from our shore, if it exists, must be derived from some other source.

Furthermore it would seem that section 581 would have to be read in connection with section 2760 of the Revised Statutes (Comp. St. § 8459½b[52]), and that, when so read, the right of visitation and search on the high seas and within 4 leagues of the coast would be restricted to vessels "bound for the United States." That section provides:

"Sec. 2760. The officers of the revenue cutters shall respectively be deemed officers of the customs, and shall be subject to the direction of such collectors of the revenue, or other officers thereof, as from time to time shall be designated for that purpose. They shall go on board all vessels which arrive

within the United States or within four leagues of the coast thereof, *if bound for the United States,* and search and examine the same, and every part thereof, and shall demand, receive, and certify the manifests required to be on board certain vessels, shall affix and put proper fastenings on the hatches and other communications with the hold of any vessel, and shall remain on board such vessels until they arrive at the port or place of their destination."

See The Apollon, 9 Wheat. 361, at bottom of page 370 (6 L. Ed. 111).

It is the universal practice, and has always been recognized as lawful, for officers of the customs, at boundaries between this and contiguous nations, to stop travelers on foot or by vehicle crossing such boundary to examine and search to determine whether they and their effects may properly be permitted to enter the country. Revised Statutes, §§ 3098, 3099, 3100, 3101 (Comp. St. §§ 5810–5813). This authority has been exercised for national self-protection. The right of visitation and search, provided for in acts of Congress, of ships bound for the United States, is based upon the same notion. The right to stop and search travelers at an international boundary, and the right to visit and search vessels bound for the United States within territorial waters or within 4 leagues of the shore, is, in either case, a reasonable exercise of the right of search within the Fourth Amendment, whether the officer exercising it has reasonable cause to believe that the individual or vessel entering the country or bound to one of its ports is violating its laws or not. Laws conferring such rights have existed since the foundation of the government.

But no act of Congress has ever undertaken to authorize the visitation and search in time of peace of vessels on the high seas beyond the 12-mile limit, or to authorize the stopping and search of a vehicle lawfully within the country, unless the officer has reasonable cause to believe that it was engaged at the time in violating the law, until the enactment of section 581, which would seem to do so, unless there be read into it a clause requiring the officer to have reasonable cause to believe that the vehicle is being operated in violation of law. The Supreme Court in Carroll v. United States, supra, at the bottom of page 153, 45 S. Ct. 285, in discussing the circumstances under which search of an automobile for contraband goods concealed thereon could be made, said:

"It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary, because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search, unless there is known, to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."

As no act of Congress authorizes officers of the customs or of the Coast Guard to visit, search, and seize vessels on the high seas more than 4 leagues from our shore, does such right exist in time of peace, at common law?

In The Marianna Flora, 11 Wheat. 1, 6 L. Ed. 405, Mr. Justice Story, in speaking of the rights of a vessel on the high seas in time of peace, said:

"It is admitted that the right of visitation and search does not, under such circumstances, belong to public ships of any nation."

He further said:

"It has been held in the courts of this country that American ships offending against our laws, and foreign ships in like manner offending within our jurisdiction, may afterwards be pursued and seized upon the ocean, and rightfully brought into our ports for adjudication. This, however, has never been supposed to draw after it any right of visitation or search. The party, in such case, seizes at his peril. * * * *"

In other words, at the common law, if a person, whether an officer of the government or not, seizes a vessel on the high seas for a forfeiture to the government, he does so at his peril.

In The Caledonian, 4 Wheat. 100, 101, 4 L. Ed. 523), Mr. Justice Story again in speaking of the same subject, said:

"It is a general rule, that any person may seize any property forfeited to the use of the government, either by the municipal law, or by the law of prize, for the purpose of enforcing the forfeiture, and it depends upon the government itself whether it will act upon the seizure. If it adopts the acts of the party, and proceeds to enforce the forfeiture by legal process, this is a sufficient recognition and confirmation of the seizure, and is

of equal validity in law with an original authority given to the party to make the seizure. The confirmation acts retroactively and is equivalent to a command."

See, also, Wood v. United States, 16 Pet. 341, 358, 359, 10 L. Ed. 987; Gelston v. Hoyt, 3 Wheat. (star paging) 246, 310, 311, 4 L. Ed. 381; Taylor v. United States, 3 How. 197, 11 L. Ed. 559.

[2] From what is said in these early decisions, taken in connection with the statute here under consideration, it is clear that the right of visitation and search of American or foreign vessels on the high seas and beyond the 12-mile limit does not exist, but that any person may, at his peril, seize a vessel forfeited for an infraction of our laws to the use of the government, for the purpose of enforcing the forfeiture, and, if the government adopts his act and proceeds to enforce the forfeiture by legal process, his act of seizure will thereby become lawful, the same as though he had originally been authorized by act of Congress to make the seizure. But, if the government fails to adopt his act and institute legal proceedings to enforce the forfeiture, his act is illegal, for he had no authority, statutory or otherwise, to make the seizure. And this is so, whether the person making the seizure had probable cause to believe that the vessel was violating our laws and was a subject of forfeiture, and for the same reason.

Applying the foregoing to the facts in this case, it appears that the officers of the Coast Guard had no authority beyond the 12-mile limit to visit and search the vessel owned by Lee, as (1) their authority to visit and search under the act of Congress was confined to doing so within the 12-mile limit; and (2) that the seizure of the vessel and liquor beyond the 12-mile limit was illegal, for they had no authority to make the seizure, and there is no evidence in the case or finding by the court below that their act of seizure was adopted and ratified by the government by the institution of legal process to enforce a forfeiture of the boat and liquor.

Furthermore, the boat at time of the seizure had not lost its innocent character by having received liquor on board while on the high seas, for that was not a violation of any municipal law of this government; and the liquor was not contraband. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306.

[3] The search and seizure being illegal, was the evidence obtained thereby, through officials of the United States acting under color of their office, admitted at the trial in violation of Lee's constitutional rights?

In Weeks v. United State, supra, it was held that the private papers of an individual, and in Silverthorne Lumber Co. v. United States, supra, the private papers of a corporation, obtained through unlawful search and seizure by officers of the government, could not be introduced in evidence against the individual in the one case, or the corporation and its officers in the other. In the latter case, speaking of the Fourth Amendment and evidence procured in violation of it, Mr. Justice Holmes said:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed."

And in the Weeks Case Mr. Justice Day, at page 398 (34 S. Ct. 346), said:

"We therefore reach the conclusion that the letters in question were taken from the house of the accused by an official of the United States acting under color of his office in direct violation of the constitutional rights of the defendant; that having made a seasonable application for their return, which was heard and passed upon by the court, there was involved in the order refusing the application a denial of the constitutional rights of the accused; and that the court should have restored these letters to the accused. In holding them, and permitting their use upon the trial, we think prejudicial error was committed. As to the papers and property seized by the policemen, it does not appear that they acted under any claim of federal authority such as would make the amendment applicable to such unauthorized seizures. The record shows that what they did by way of arrest and search and seizure was done before the finding of the indictment in the federal court, under what supposed right or authority does not appear. What remedies the defendant may have against them we need not inquire, as the Fourth Amendment is not directed to individual misconduct of such officials. Its limitations reach the federal government and its agencies."

The decision in Agnello v. United States, 269 U. S. 20, 23, 46 S. Ct. 4, 70 L. Ed. 145,

is in accord with the cases above cited. In that case the admission in evidence of narcotics seized in Agnello's home by officers of the United States without a warrant was held to be a violation of his constitutional rights, though not of the other defendants, whose homes were not searched. In Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A. L. R. 1159, the private papers of the defendant that were admitted in evidence against him had been stolen, and delivered by the thief to the law officer of the United States; but they had been stolen without the knowledge or participation of the officers of the government. The taking was wrongful, but it was not the illegal act of the government officers, and hence the admission of the papers was held not to be a violation of the defendant's constitutional rights.

As to the third contention of the defendant, we think that he takes nothing by his exception.

The evidence obtained through the unlawful search and seizure having been introduced at the trial in violation of Lee's constitutional rights, the judgment must be vacated, the verdict set aside, and the case remanded for a new trial.

The judgment of the District Court is vacated, the verdict is set aside, and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

ANDERSON, Circuit Judge (dissenting). I am unable to agree with the opinion of the majority or in its result; but I shall indulge in no elaborate statement of my views, or analysis of the authorities on which those views are based. Briefly, I think the case falls within the rule laid down in Adams v. New York, 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575, and not under the doctrine of Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319, Amos v. United States, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654, and Gouled v. United States, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647.

I cannot believe that Lee's constitutional rights were infringed by the court's admission of evidence of his arrest and the seizure of his motorboat partially loaded with alcohol at rum row on the high seas, in support of an indictment for conspiracy to smuggle alcohol. Whether this seizure was legal or illegal seems to me to be entirely immaterial. In either aspect, it was not unreasonable, and therefore unconstitutional.

Carroll v. United States, 267 U. S. 132, 148, 149, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790.

The Supreme Court has never yet laid down the broad rule that evidence obtained by any illegal conduct of officials is therefore inadmissible. No such standard of purity of origin is practicable. It is only evidence obtained in disregard of the Fourth Amendment, and offered in derogation of the Fifth Amendment, that is excluded under the rule now relied upon. This distinction is clearly brought out in Agnello v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145, where evidence obtained in breach of Agnello's constitutional rights was held incompetent against him; but, though obtained by illegal conduct, it was held competent as against the other defendants. Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A. L. R. 1159, is an emphatic assertion of the same general doctrine.

The majority opinion expresses dissent from the views of the Circuit Court of Appeals for the Second Circuit in the Underwriter Case. While, as already indicated, I doubt whether the question involved in the Underwriter Case is involved in the case now before us, I desire to add that, as I understand the opinion in that case, I am in accord with it.