## CHARLEY HEE v. UNITED STATES.

Circuit Court of Appeals, First Circuit.
May 17, 1927.

No. 2094.

1. Aliens ⊂⇒32(13)—Hearing appeal from commissioner's order of deportation solely on transcript of testimony and memorandum of decision is permissible under agreement.

Hearing of appeal in District Court from order of deportation by commissioner, solely on transcript of testimony taken before commissioner, together with his memorandum of decision, though not a satisfactory way to deal with matter involving principally the credibility of witnesses, is permissible where parties agree thereto.

2. Aliens ⊂⇒32(4)—Arrest and imprisonment of Chinese person as being unlawfully within United States without warrant held illegal (Comp. St. § 4313).

Under Comp. St. § 4313, authorizing arrest of Chinese persons found unlawfully within United States, on warrant issued on complaint under oath, an arrest and imprisonment before issue of warrant therefor is illegal.

**3. Aliens ⬤⇒32(12)—Objections to use of statement unlawfully obtained from prisoner will not be sustained, where made for first time at argument of appeal, unless necessary to correct clear and grave miscarriage of justice.**

Where statement was obtained from Chinese person by unjustifiable methods after his arrest and imprisonment without a warrant, but, although represented by counsel in deportation hearing before both commissioner and District Court, he made no objection to use of statement on either occasion, objections to use of statement will not be sustained, when made for first time at argument of appeal, where not necessary to correct a clear and grave miscarriage of justice.

**4. Aliens ⬤⇒32(12)—Appellate court accepts concurring conclusions of commissioner and District Court, ordering deportation of alien, unless clearly wrong.**

Circuit Court of Appeals, on appeal from decree holding order of deportation by commissioner was justified, accepts concurring conclusions of tribunals below, unless convinced they were clearly wrong.

Anderson, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Massachusetts; Elisha H. Brewster, Judge.

Deportation proceeding by the United States against Charley Hee, alias Dong Bow Hee. From a decree of the District Court, holding that the commissioner's order of deportation was justified, defendant appeals. Affirmed.

Edward J. Casey, of Boston, Mass., and H. W. Sullivan, of Jamaica Plain, Mass. (Edward P. Barry and Barry, Casey & Sullivan, all of Boston, Mass., on the brief), for appellant.

John W. Schenck, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., of Gloucester, Mass., on the brief), for the United States.

Before JOHNSON and ANDERSON, Circuit Judges, and MORTON, District Judge.

MORTON, District Judge. [1] This is a deportation case under the Chinese Exclusion Act. It was heard in the first instance by Commissioner Jenney, who made an order of deportation from which the defendant appealed. In the District Court the appeal was heard,—apparently by agreement of parties, —solely upon a transcript of the testimony before the commissioner, together with his memorandum of decision. It is not a satisfactory way to deal with a matter involving principally the credibility of witnesses, but permissible if the parties agree. See Liu Hop Fong v. United States, 209 U. S. 453,

28 S. Ct. 576, 52 L. Ed. 888; Jung See v. Nash, 4 F.(2d) 639, C. C. A. 8th. The District Judge in a short memorandum held that the commissioner's decision "was justified." The present appeal was then taken. It presents certain questions of evidence, and a basic question whether the decision was right.

The appellant claims that he is an American citizen, that he was born in Oroville, Cal., about 44 years ago, that he came to Boston when about 10 years old and has lived here ever since, and that he registered here in the draft as an American citizen. The evidence shows that for about four years before his arrest, he conducted a Chinese laundry on Beacon street, Boston. On Saturday evening, September 19, 1926, a Chinese inspector, without a warrant or process of any kind, arrested him at his laundry, where he was peaceably at work, took him to police station 16, and proceeded to question him in the presence of an interpreter and a stenographer. He was held at station 16 without any process until Monday, when a warrant was procured. The defendant's statement made at this time was admitted in evidence against him, not being objected to by his counsel at either hearing. He now contends for the first time that it should have been excluded and disregarded.

[2] The arrest and the ensuing imprisonment before the issue of the warrant were plainly illegal. The statute in question provides that "any Chinese person, or person of Chinese descent, found unlawfully in the United States, or its territories, may be arrested upon a warrant issued upon a complaint, under oath, filed by any party on behalf of the United States." 25 Stat. 476–479; U. S. Comp. Stats. 1916, § 4313. The rules of the Department of Labor, as we understand them, also provide that a warrant should be procured before the Chinese person is arrested. See rules 23 and 24. This is similar to the practice under the Immigration Act. The cases relied on by the government arose under a different statute (27 Stats. 25 [Comp. St. §§ 4315–4323]), relating to Chinese laborers, who failed or neglected to take out certificates of registration. See Fong Yue Ting v. United States, 149 U. S. 698, 728, 13 S. Ct. 1016, 37 L. Ed. 905.

[3] That the statement was obtained by entirely unjustifiable methods is too clear for discussion. It would not be admissible against the defendant over objection by him in any judicial proceeding, and if used against him in administrative proceedings, where the tribunal itself is charged with the

duty of safeguarding the defendant's rights would vitiate the result. The present proceedings were civil in their nature and judicial in character. The defendant was represented before both the commissioner and the District Court by counsel, who, as above stated, made no objection to the use of the statement on either occasion. There is no assignment of error upon it. While the commissioner or the District Judge might well on his own motion have refused to hear it, it would be going too far to say that their failure to do so constituted reversible error, or that this court hearing the case upon the same record as the District Court ought to entertain an objection to this evidence, here made for the first time. Such action would be justified only when necessary to correct a clear and grave miscarriage of justice.

The evidence does not satisfy us that such is the fact. While the testimony, if believed, was strongly in the appellant's favor, there were significant facts which militated strongly against him. Although on his story, he has spent all his life in the United States, he can speak but very little English, far less than would be expected of such a person born and brought up here. The identification of him as the Chinaman who worked in a laundry on Howard street for many years, while positively stated by three witnesses, two of them white persons, is distinctly weakened by certain parts of the testimony of the white witnesses. The real reason for the commissioner's conclusion appears to have been his solid conviction that the man before him could not be, in view of his appearance and his ignorance of our language and ways, a life-long resident of this country. It is a strong ground which the record on appeal can only imperfectly reproduce. The finding of the District Judge, while it does not carry the same weight as if he had seen the witnesses, is not without significance.

[4] This court accepts the concurring conclusions of the tribunals below unless convinced that they were clearly wrong. In this case, for reasons already stated, the burden on the defendant is heavier than usual. He has not met it.

The decree of the District Court is affirmed.

ANDERSON, Circuit Judge (dissenting). With deference, I submit that my brethren have reached an erroneous result, on an opinion which fails adequately to present the real case and the important issues involved. As the case is, in type, one of many, illustrating

19 F.(2d)—22

what I regard as the grossly illegal methods prevailing in the Department of Labor in Chinese exclusion proceedings, I think it warrants a pretty full statement of the evidence and the applicable statutes and decisions. The case arises under the Chinese Exclusion Act, which provides that:

"Any Chinese person, or person of Chinese descent, found unlawfully in the United States, * * * may be arrested upon a warrant issued upon a complaint, under oath, filed by any party on behalf of the United States, by any justice, judge, or commissioner of any United States court, returnable before any justice, judge, or commissioner of a United States court, * * * and when convicted, upon a hearing, * * * adjudged to be one not lawfully entitled to be or remain in the United States, such person shall be removed from the United States to the country whence he came." Section 13, Act of September 13, 1888 (25 Sts. 476, 479 [Comp. St. § 4313]). Compare 32 Sts. p. 176; 33 Sts. pp. 394, 428.

Section 3 of the Act of March 3, 1901 (31 Sts. 1093 [Comp. St. § 4334]), provides:

"That no warrant of arrest for violations of the Chinese exclusion laws shall be issued by United States commissioners excepting upon the sworn complaint of a United States district attorney, assistant United States district attorney, collector, deputy collector, or inspector of customs, immigration inspector, United States marshal, or deputy United States marshal, or Chinese inspector, unless the issuing of such warrant of arrest shall first be approved or requested in writing by the United States district attorney of the district in which issued."

The proceedings fall under rule 24 of the Department of Labor, which provides, in paragraph 1:

"Chinese inspectors and immigrant inspectors shall examine all Chinese persons resident or found within the United States not personally known to them to be legally entitled to be and remain in the country. * * * Deportation proceedings under the Chinese exclusion laws are commenced by the filing of a complaint under oath before a justice, judge or commissioner of the United States by any officer specified in section 3, Act of March 3, 1901, on behalf of the United States, alleging that the Chinese has been found unlawfully in the United States or its territories, in violation of a particular section of the statute applicable, and by the arrest of the Chinese under warrant issued upon such complaint, the warrant being returnable be-

fore any justice, judge or commissioner of a United States court or before any United States court."

Manifestly—concededly—proceedings under this statute and rule are strictly judicial. The questions now presented are, therefore, radically different from those arising in the familiar habeas corpus case, involving, ordinarily, the rights of aliens only; in which executive orders are conclusive, unless illegal or grounded on unfair hearing; and fair hearing does not require even substantial conformity to the best evidence rules prevailing in judicial proceedings.

The vital distinction between executive orders and the trial procedure underlying such orders, and judicial proceedings, seems to have been overlooked by appellant's counsel at the trial of this case. In the present case the ultimate question is whether the appellant is a native-born citizen. This question he is entitled to have determined under all the safeguards attaching to judicial proceedings. The case was first heard by Commissioner Jenney, who entered an order of deportation. It was then submitted to the District Court on the commissioner's finding and a transcript of the evidence. The District Judge saw none of the witnesses. He was therefore in no better position to judge the crucial question of their credibility than is this court.

To present the questions here involved, it is necessary to state the facts in considerable detail. Counsel for the government argues (there is no evidence to support the claim) that in September, 1925, the Chinese inspectors had information that "a Tong war" was in prospect. As a result, they organized a raid upon the Chinese in and about Boston, arresting them at sight. Assuming belief in this prospective Tong war as an excuse (however flimsy and unsound) for the lawless procedure of these law-enforcing officials, there is nothing whatever to indicate that the appellant was a member of any Tong, or was even suspected of being a prospective participant in any war. The commissioner finds, as the evidence requires, that, at least since 1918, appellant had been a laundry-worker in Boston, occupying (apparently owning) with another Chinese a laundry at No. 812 Beacon street; that he registered for the draft in 1918, and had been in good repute since that time. There was also evidence, on its face credible, that he had been in Boston 22 or 23 years. It follows that he had been, for years, daily, available for proper inquiry by the Chinese inspectors relative to his right to be and remain in the United States.

But on Saturday afternoon, September 19, 1925, a Chinese inspector, apparently accompanied by members of the Boston police force, entered this laundry, arrested the appellant and his associate, and took him over to police station 16. There he was put under oath (compare Whitfield v. Hanges [C. C. A.] 222 F. 745, 749), examined by a Chinese inspector, with an interpreter and a stenographer; then, without issuing any warrant or other process, he was put into a cell and there kept from Saturday afternoon until Monday, when he was bailed out. It is upon the statements made, affirmative and negative, by the appellant, under these circumstances, that the commissioner mainly relies for his finding that the appellant's testimony given before him in December, 1925 —as a primary tribunal of fact, in judicial proceedings—is false; thus reaching the result that the appellant was not, as he testified, born in the United States and a citizen of the United States, but was born in China and was unlawfully in the United States.

The gist of the case as the commissioner saw and determined it appears from the following excerpt from his memorandum of decision:

"I find as a fact that at the time the defendant was arrested on September 19, 1925, he stated under oath that his only name was Charley Hee. He appeared in the hearing before me and said that his name is sometimes known as Dong Bow Hee.

He stated on said September 19, 1925, at the time of his arrest, under oath, in examination through a Chinese interpreter, in answer to questions propounded by John A. Carney, as follows:

'Q. 1. What is your present age, occupation and address? A. I don't know.

Q. 2. How old are you? A. Laundryman, 812 Beacon street.

Q. 3. Where were you born? A. San Francisco.

Q. 4. Where? A. I don't know the street.

Q. 5. How do you know you were born in San Francisco? A. I only know that I was born in San Francisco; that is all.

Q. 6. How do you know? A. I don't know.

Q. 7. How long did you remain in San Francisco after your birth? A. I don't know.

Q. 8. How long have you been living in Boston? A. I don't know.

Q. 9. Have you been living here a week? A. I don't know how long.

Q. 10. Have you been living here a week? A. I have been here a long time.

Q. 11. How long have you been in Boston? A. About fifteen years.

Q. 12. From where did you come at that time? A. I don't know where I come from.

Q. 13. Do you know how old you are? A. I don't know.

Q. 14. Have you any paper showing your right to remain in the United States? A. I have no papers.

Q. 15. Are your parents living? A. Both dead.

Q. 16. What were their names, and where did they die? A. I don't know.

Q. 17. Did you ever see your father? A. No.

Q. 18. Did you ever see your mother? A. No.

Q. 19. Did either of your parents ever live in the United States? A. Yes, in San Francisco.

Q. 20. Which one? A. Both lived there.

Q. 21. Is there anyone in the United States that can testify to your birth in the United States? A. No.'

The defendant also stated that he understood the interpreter in the examination.

In the testimony before me the defendant testified that he was born in Oroville, California; that he is now 44 years of age; that his father's name was Dong Yook Ngar and his mother's name was Moy Shee. The defendant also testified that he left said Oroville when he was ten years of age, and came to Boston with his uncle and has been here ever since. There was no evidence to substantiate his claim that he was born in Oroville, California, except from the testimony of Moy Hin."

After brief discussion of the other evidence (which he held unsatisfactory), the commissioner concluded:

"I find upon all the evidence that the defendant was not born in the United States; that he is a Chinese laborer unlawfully found in the United States; that he should be deported to China, the country whence he came."

Plainly the main basis of this conclusion —really of perjury and of alienage—was the evidence of the appellant's statement taken at the police station. The facts that deportation proceedings are, in theory, civil—Fong Yue Ting v. United States, 149 U. S. 698, 13 S. Ct. 1016, 37 L. Ed. 905; Wong Wing v. United States, 163 U. S. 228, 236, 16 S. Ct. 977, 41 L. Ed. 140—and that in this case the order is (in form) that a Chinese alien be sent back to his native land, must not be permitted to disguise the real nature of the find-. ing and its effect upon the appellant. If his contention of birth in the United States be true, he is deprived of American citizenship and banished, in middle life, to an alien land, and deprived of everything which makes even the somewhat meagre life of a laundryman worth living. Practically, if he be a citizen, the decision inflicts upon him a punishment greater than that inflicted upon any convicted criminal, short of death or long imprisonment. Ng Fung Ho v. White, 259 U. S. 276, 284, 42 S. Ct. 492, 66 L. Ed. 938. In result, the proceedings are highly penal. And this result is grounded, mainly if not entirely, on evidence grilled from the appellant while held in lawless custody by inspectors and police. While at the hearing his examination relative to the conditions under which he made these statements was inadequate, enough appears to give a meagre picture of his probable state of mind:

"X-Q. 41. Why did you refuse to tell them your other name? A. I was scared at that time, because when I working at the laundry they came in and arrested me, but I didn't know why they arrest me, so I scared.

X-Q. 42. Didn't they tell you that they were taking you to the station house to find out from you whether you had a right to be in the United States? A. I forget whether they asked me that or not.

X-Q. 43. Nobody did anything to you to frighten you, did they? A. They just halloa to me to go, that is all, so I am afraid. * * *

X-Q. 47. Do you recall that you were asked this question: 'What is your present age, occupation and address?' and your answer 'I don't know how old I am; laundryman; 812 Beacon street, Boston, Mass.'? A. Yes, at the time they asked me that question, but at the time I am so upset and kind of dizzy that I did tell them I forgot what age I am, but now I think it over and I reckon it up, and then I remember how old I was."

If this were a criminal prosecution, and if this evidence, extorted from the appellant while under unlawful restraint and duress, had been seasonably objected to, a conviction would of course have to be reversed. Compare Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568, and cases cited; Guan Lee v. United States (C. C. A.) 198 F. 596; Whitfield v. Hanges (C. C. A.) 222 F. 745; Ziang Sung Wan v. United States, 266 U. S. 1, 45 S. Ct. 1, 69 L. Ed. 131.

The main question on this record is, whether evidence, thus obtained by lawless seizure of the appellant's person and search

of his mind and memory while under terror-izing duress, can be made the basis of a finding that he is not an American citizen and an order for his banishment to China. Ungar v. Seaman (C. C. A.) 4 F.(2d) 80, 84; Crooker v. Knudsen (C. C. A.) 232 F. 857.

In Bilokumsky v. Tod, 263 U. S. 149, 155, 44 S. Ct. 54, 56 (68 L. Ed. 221), the court, by Mr. Justice Brandeis, said:

"It may be assumed that evidence obtained by the department through an illegal search and seizure cannot be made the basis of a finding in deportation proceedings. Compare Silverthorne Lumber Co. v. United States, 251 U. S. 385 [40 S. Ct. 182, 64 L. Ed. 319]; Gouled v. United States, 255 U. S. 298, [41 S. Ct. 261, 65 L. Ed. 647]. But mere interrogation under oath by a government official of one lawfully in confinement is not a search and seizure."

Conversely, interrogation by a government official of one unlawfully in confinement is an illegal search and seizure, which cannot be made the basis of a finding in deportation proceedings. This observation was made in a habeas corpus case, involving the rights of an admitted alien charged with sedition, and not in judicial proceedings in which the ordinary rules of evidence prevail. The sound doctrine thus enunciated is, a fortiori, applicable to proceedings concededly judicial and where the fundamental issue is citizenship. Compare Ng Fung Ho v. White, 259 U. S. 276, 281, 282, 283, 42 S. Ct. 492, 66 L. Ed. 938. To seize the person and search the memory of the frightened victim is a far grosser invasion of personal liberty and disregard of due process of law than is the search for and the seizure of papers, even from a home or from an office as in the Gouled Case.

But it is urged that a transcript or alleged transcript of the plaintiff's examination at the police station was admitted in evidence before the commissioner without objection by the appellant, who was then represented by counsel. This is true; but it does not follow that this court, which is the ultimate tribunal of fact, is bound by this admission or by the weight given to this evidence by the commissioner and (pro forma) by the District Court. If the evidence should have been excluded as incompetent, failure of appellant's counsel seasonably to grasp the right of their client in that regard does not require this court to hold the appellant's rights thus frittered away. Rule 11 provides that this court "at its option may notice a plain error not assigned." Compare rule 24, par. 4. I have no doubt of the

power of this court to regard this incompetent evidence as struck from the record, even although appellant's counsel did not at the hearing make the point. Apparently that was what the Supreme Court did in the Bram Case, supra. At any rate, in 168 U. S. 573, 18 S. Ct. 183, 42 L. Ed. 568, near the end of Mr. Justice Brewer's dissent (concurred in by Justices Fuller and Brown) it is stated that Bram's confession was properly received "because no motion was made to strike it out and no exception taken to its admission." But the majority dealt with the question on its intrinsic merits.

It is not, I think, necessary to rest our conclusion on this court's power to deal with a plain error not assigned, for I reach the same result whether I regard the evidence as excluded or admitted by waiver, and then proceed to assess its proper weight and significance. Plainly, this court is not bound by the commissioner's views that this evidence warrants his conclusion that the appellant's sworn testimony before him was false.

Regard must be had to the vital difference between real judicial procedure (this appellant's right in this case) and the plan adopted by the Chinese inspectors of arresting him, putting him (at any rate in form) under oath, supplying their own interpreter and stenographer, and then taking (again in form) his deposition, for use at the subsequent trial of citizenship. The law entitled the appellant to have all of his evidence taken before a judicial tribunal, with an interpreter sworn and functioning under the eye of the court—(the commissioner was pro hac vice a court)—with counsel, and friends understanding the Chinese language, present to guard his rights, and especially his rights to correct interpretation and transcription of his testimony as he actually gave it. Errors—even frauds—are deplorably frequent in the interpretation of the testimony of witnesses speaking foreign languages. Apart from the duress and terror under which the appellant answered questions, it is impossible to be confident that we have an accurate report of what he really said. It comes to us through both an interpreter and a stenographer, not a part of the machinery provided for real judicial procedure.

Even when fairly and fully tried, the questions involved in these cases of conflicting evidence as to birth and residence in the United States involve great difficulties for the fact-finding tribunals. I think this court should make it clear that these in-

trinsic differences are not to be unnecessarily exaggerated by the confusion and doubt arising from such lawless procedure on the part of inspectors and policing forces, as this record presents. We ought not to be remitted to mere guess-work concerning fundamental human rights, when the law requires orderly judicial methods in order to reduce to a minimum the chances of error in reaching conclusions of fact.

For my part, after careful consideration and reconsideration of this record, I find it impossible to reach any reasonably confident conclusion as to whether the appellant is, as he claims to be, an American-born citizen—or is, as the commissioner found, an alien—who has committed gross perjury.

Courts are frequently constrained to declare mistrials when even a single juryman has been found to have indulged in improper association with the litigating parties or to have heard prejudicial statements not admitted in open court. But such irregularities are trifling compared with the irregularities in this record, on which the government seeks to have this court, as a tribunal of fact, reach a conclusion as to the truth or intentional falsity of the appellant's testimony and its result—his citizenship or alienage.

Emphasis is lent to the general importance of the questions now presented, by the argument of the assistant United States attorney to the effect that the burden is upon all Chinese, wherever born (compare Ng Fung Ho v. White, 259 U. S. 276, 283 and cases cited, 42 S. Ct. 585, 66 L. Ed. 1074) to show affirmatively to the inspectors, and at all times and in all places, their right to be in this country, and that power has been vested in the Chinese inspectors to arrest at sight, without warrants or any other process, any Chinese person, whether found on the street, in his home or at his place of business. The proposition that an American citizen, of any race, is subject to arrest at the hands of police officials, federal or state, without warrant and without any of the other preliminary conditions referred to in Carroll v. United States, 267 U. S. 132, 156, 168, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, I suppose we all reject.

It is true that under section 6 of the Act of May 5, 1892 (27 Stat. 25), as amended by section 1 of the Act of November 3, 1893 (Comp. St. § 4320), all Chinese laborers within the limits of the United States who were entitled to remain in the United States before the passage of this act were required to obtain certificates of residence, and that such Chinese laborers found without such certificates were subject to arrest by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, to be taken before a United States judge for deportation. But this requirement for an identifying certificate was in nature and in terms applicable only to Chinese laborers (aliens) then lawfully within the United States. It was not, and could not be, applicable to native-born citizens of the Chinese race. Nowhere do we find any statute making native-born citizens of any race subject to arrest at the will of inspectors or of other officials, for failure then and there to satisfy such officials of their citizenship and right to be in this country. We have not yet reached the stage where the constant possession of a birth certificate, authenticated in some fashion, can be required of any citizen—as an automobile driver is required to have, under state law, his driver's license in order to justify his operation of a motor car in a public street. The statutes and the rule of the department, supra, all refute the government's present claim and condemn the practice of the inspectors. It is high time to insist that law-enforcing officials be law-abiding in the performance of their official duties.

American citizens of Chinese blood have rights as sacred and as firmly grounded in our constitutional law as are the rights of the descendants of those who came over in the Mayflower. Those rights cannot be disregarded, either justly or with safety to our institutions. This court as a tribunal of fact should not be called upon to find perjury and alienage, and to enter judgment of deportation, without evidence which fairly convinces the mind that the appellant's claim of citizenship is false. The objections to the evidence, which apparently controlled the result in the commissioner's mind, are not technical. They are fundamental. They go to its credibility, to its power to lead the dispassionate mind to a reasonably confident conclusion either for or against the appellant's claim. Our duty as a tribunal of fact as well as of law does not require us to sustain decisions on questions of fact involving fundamental human rights by methods purely legalistic, scholastic.

I recognize that my brethren have, in fairly strong terms, condemned the arrest and ensuing imprisonment as plainly illegal; but the results of this condemnation are largely nullified by the affirmation of the

judgment below, grounded largely, if not mainly, on the illegal methods verbally condemned. The way to stop such gross invasion of fundamentally important human rights is to refuse to affirm decisions grounded thereon. To do this, it is not necessary to set up any impossible standard of perfection.

Compare Lee v. United States (C. C. A.) 14 F.(2d) 400, 406; Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A. L. R. 1159; Agnello v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145.

I think the proper disposition of this case is to hold it a mistrial; to remand the case to the court below, with instructions to discharge the appellant, but without prejudice to the government's right at any time, by proper legal proceedings, to test the question of the appellant's citizenship and right to remain in this country. Such a course would be in close analogy to that followed in Ungar v. Seaman (C. C. A.) 4 F.(2d) 80, 85, and in Whitfield v. Hanges (C. C. A.) 222 F. 745, 756. Cf. Colyer v. Skeffington (D. C.) 265 F. 17, 78; In re Petkos (C. C. A.) 214 F. 978.